Jack K. **WICKES**, Plaintiff-Appellant,

v.

**OLYMPIC AIRWAYS**, a Foreign Corporation, Defendant-Appellee.

No. 83–1217.

United States Court of Appeals, Sixth Circuit.

Argued April 13, 1984.

Decided Oct. 3, 1984.

**364**

Michael M. Hathaway (argued), Vande-veer, Garzia, Tonkin, Kerr & Heaphy, Detroit, Mich., for plaintiff-appellant.

John F. Brady, Riley & Roumell, Detroit, Mich., Ellen J. Winner (argued), Rabinow-itz, Boudin, Standard, Krinsky & Lieberman, New York City, for defendant-appellee.

Before KEITH and MERRITT, Circuit Judges, and WEICK, Senior Circuit Judge.

MERRITT, Circuit Judge.

In this treaty interpretation case, Olympic Airways, a foreign corporation owned by the government of Greece, argues that a 1951 Treaty between the United States and Greece immunizes Greek corporations from employment discrimination claims brought under state law—in this case, a Michigan statute prohibiting age and national origin discrimination. Based on our construction of the Treaty, we find no necessary conflict between the Michigan statute and the Treaty in this case. The Treaty affords foreign corporations only a narrow right to discriminate in favor of Greek citizens in filling managerial and technical positions within the company's American-based offices and does not give foreign corporations the broad right to violate our antidiscrimination laws in their hiring practices.

**I.**

Plaintiff Jack Wickes is a sixty-one year old Caucasian male of United States citizenship and non-Greek national origin. He was employed by Olympic Airways from 1967 until he was terminated as a district sales manager in Michigan in 1980. In 1982, he filed this action arising under state law alleging that Olympic discriminated against him on the basis of his age and national origin in violation of the Elliott-Larsen Civil Rights Act of 1976, Mich. Comp.Laws Ann. § 37.2202 (West Supp. 1984), and breached an implied employment contract. He did not file the federal administrative claims which are prerequisite to a suit under Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act, and concedes that he is now barred from doing so by the applicable statutes of limitations. Defendant filed a motion for summary judgment, alleging

that Olympic is immune from employment discrimination claims under Article XII(4) of a 1951 Treaty between Greece and the United States which provides:

> Nationals and companies of either party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other employees *of their choice* among those legally in the country and eligible to work....

Treaty of Friendship, Commerce and Navigation, Aug. 3 & Dec. 26, 1951, United States-Greece, 5 U.S.T. 1829, T.I.A.S. No. 3057 (emphasis added). Olympic argues that the "of their choice" language in Article XII of the Treaty creates a broad exception to the labor and employment discrimination laws of the United States and is inconsistent with the Michigan employment discrimination statute.

The District Court granted summary judgment for defendants. In a decision from the bench, the District Judge held that plaintiff's claim was barred as a matter of law. He interpreted the language of the Greek Treaty as precluding the cause of action and held that the breach of contract claim was meritless because plaintiff's deposition testimony would not support an implied contract claim under Michigan law. Plaintiff appeals from the District Court's disposition of his claim.

## II.

■ In interpreting the Treaty, our role is to give "effect to the intent of the Treaty parties." *Sumitomo Shoji America v. Avagliano*, 457 U.S. 176, 185, 102 S.Ct. 2374, 2380, 72 L.Ed.2d 765 (1982). The views of the State Department weigh heavily in our analysis, because "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961). As the *Sumitomo* case makes clear, "when the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation." 457 U.S. at 185, 102 S.Ct. at 2380 (footnote omitted). Thus, at our request, the State Department filed a brief *amicus curiae* concerning the proper interpretation of the Greek Treaty, and we agree with their interpretation of the rights afforded under the Treaty.

Olympic maintains that the "of their choice" language in the Greek Treaty provides it with a "true advantage with respect to employment prerogatives" in the form of complete immunity from employment discrimination laws, and perhaps American labor laws in general. This argument depends heavily on Olympic's contention that there is a clear conflict between its rights under the Treaty and the Michigan law prohibiting various forms of employment discrimination, and that in that conflict, the Treaty must prevail. We agree with plaintiff and the Department of State that this expansive interpretation of the Greek Treaty is incorrect. Although it is true that a treaty prevails over inconsistent state law, we are satisfied that the two laws need not be interpreted in a way that puts them in conflict.

## A.

■ The legislative history of the Greek Treaty contains substantial evidence that Article XII was intended to be a narrow privilege to employ Greek *citizens* for certain high level positions, not a wholesale immunity from compliance with labor laws prohibiting other forms of employment discrimination. The Supreme Court emphasized in *Sumitomo* that the basic "purpose of the treaties [of Friendship, Commerce and Navigation] was not to give foreign corporations greater rights than domestic companies, but instead to assure them the right to conduct business on an equal basis without suffering discrimination based on their alienage." 457 U.S. at 188, 102 S.Ct. at 2381.

The Greek Treaty is one of an extensive series of similar treaties of Friendship, Commerce and Navigation entered into by the United States and its trading partners following World War II. *See Commercial Treaties: Hearings on Treaties of Friendship, Commerce and Navigation with Israel, Ethiopia, Italy, Denmark, Greece, Finland, Germany and Japan Before the Subcomm. on Commercial Treaties of the Senate Foreign Relations Comm.*, 83d Cong., 1st Sess. 6 (1953) [hereinafter cited as *1953 Hearings*]; *see also* 99 Cong.Rec. 9312 (1953) (statement of Sen. Hickenlooper, presenting Greek Treaty for Senate ratification). According to Herman Walker, the negotiator of the Greek Treaty and many similar treaties, the bilateral treaties of Friendship, Commerce and Navigation "define the treatment each country owes the nationals of the other; their rights to engage in business and other activities within the boundaries of the former; and the respect due them, their property and their enterprises." Walker, *Modern Treaties of Friendship, Commerce and Navigation*, 42 Minn.L.Rev. 805, 806 (1958) [hereinafter cited as *Modern Treaties*]. Such commercial treaties have been used by the United States since the Revolutionary War, but according to Walker,

> [a] new consideration ... which lent special impetus to the program following World War II, was the need for encouraging and protecting foreign investment, responsively to the increasing investment interests of American business abroad and to the position the United States has now reached as principal reservoir of investment capital in a world which has become acutely "economic development" conscious.

Walker, *The Post-War Commercial Treaty Program of the United States*, 73 Pol. Sci.Q. 57, 59 (1957). In addition, these post-World War II commercial treaties differed from their predecessors in that:

> [i]n the treaties of the 20's and 30's, the rights of entry of individuals had been subjected to a sweeping immigration laws exception. Now, however, firm rights are provided for the entry and indefinite sojourn of international traders and principal investors ... [M]anagement is assured freedom of choice in the engaging of essential executive and technical employees in general, regardless of their nationality, without legal interference from "percentile" restrictions and the like ....

Walker, *Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice*, 5 Am.J. Comp.L. 229, 234 (1956) [hereinafter cited as *Present United States Practice*].

In these commercial treaties, including the Greek Treaty, foreign nationals doing business in the host country were generally accorded two rights, relative in nature, sometimes called "contingent standards." Walker, *Modern Treaties, supra*, at 811. The first, called "most-favored nation treatment," assures treatment no less favorable than the treatment of aliens or companies from other countries. The second, "national treatment," assures nondiscrimination or no less favorable treatment than the citizens or companies of the host country. *Id.*

"Non-contingent," non-relative or absolute standards also played an important role in the formulation of treaty provisions. Walker describes this as "rule-making in independent terms, without reference to the treatment given to others." *Id.* Non-contingent standards were intended to protect vital rights and privileges of foreign nationals in any situation, whether or not a host government provides the same rights to the indigenous population. *Id.* at 823; *see also* Wilson, *Postwar Commercial Treaties of the United States*, 43 Am.J. Int'l L. 262, 264 (1949).

Post-war commercial treaties such as the Greek Treaty create both contingent and non-contingent rights. Although the "basic rule to govern the conduct of international trade pursuant to a treaty in the post-war period is national treatment," whereby the alien is "entitled freely to carry on his chosen business under conditions of non-discrimination, and to enjoy the same legal opportunity to succeed and

prosper on his merits as is allowed citizens of the [host] country," such treaties generally also include the non-contingent guarantee that the alien and his property "shall receive not only equal protection, but also a certain minimum degree of protection, as under international law, regardless of a Government's possible lapses with respect to its own citizens." *Present United States Practice, supra,* at 232.

Article XII of the Greek Treaty, the provision we must construe in this case, employs both contingent standards, and a non-contingent guarantee with respect to management of the investment. Thus in paragraph 1, nationals and companies of either party are accorded within the territory of the other both "national treatment and most-favored-nation treatment with respect to engaging in commercial, manufacturing, processing, financial, construction, publishing, scientific, philanthropic and professional activities, except the practice of law, dentistry and pharmacy."

In our case we are dealing with the non-contingent right or standard. Paragraph 4 of Article XII contains an absolute rule permitting foreign nationals a certain guaranteed range of control of their overseas investments:

> Nationals and companies of either Party shall be permitted to engage within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other employees *of their choice* among those legally in the country and eligible to work. Moreover, such nationals and companies shall be permitted to engage, on a temporary basis, accountants and other technical experts, *regardless of nationality* and regardless of the extent to which they may possess the qualifications required by applicable laws for the exercise of their duties within the territories of such other Party, for the particular purpose of making examinations, au-

dits and technical investigations ˙for the exclusive account of their employers in connection with the planning and operation of enterprises controlled by the latter or in which they have a financial interest within such territories. (emphasis added).

Although the contingent, national treatment standard is the hallmark of the treaties of Friendship, Commerce and Navigation, the language of Article XII(4) of the Greek Treaty technically goes beyond national treatment by adding a non-contingent standard "to prevent the imposition of ultra-nationalistic policies with respect to essential executive and technical personnel." Walker, *Provisions on Companies in the United States Commercial Treaties,* 50 Am.J.Int'l L. 373, 386 (1956).

Thus Article XII of the Greek Treaty guarantees companies of either party doing business within the territory of the other the right to engage essential executive and technical personnel "of their choice ... regardless of nationality." The juxtaposition of the words "of their choice" and "regardless of nationality" has been interpreted by the State Department as creating both a right to employ and a limitation on that right. *See 1953 Hearings, supra,* at 9 (tabular comparison on Greek Treaty with other Friendship, Commerce and Navigation treaties). Under this interpretation, companies of either party are permitted to discriminate in favor of their own nationals or citizens for certain high level positions, but not to discriminate against others in the labor force of the host country on any other basis. The words "of their choice" merely reflect the intent of both the United States and Greece to give the other's companies the freedom to fill designated critical positions without interference from local laws and regulations. *See generally* H. STEINER & D. VAGTS, TRANSNATIONAL LEGAL PROBLEMS 37–38 (1968).[1]

---

1. The post-World War II Friendship, Commerce and Navigation treaties were negotiated in a period characterized by so-called "percentile" restrictions which required American companies operating abroad to hire a certain percent-

age of citizens of the host country. These restrictions were thought to have the effect of inhibiting American companies operating abroad from hiring the people in whom they had the greatest confidence. Similarly, a num-

Additional support for this interpretation of the rights afforded by the Greek Treaty may be found in the fact that when the Treaty was being considered in the Senate, nine states had enacted laws prohibiting private employment discrimination. *See* Note, *Commercial Treaties and the American Civil Rights Laws: The Case of Japanese Employers*, 31 Stan.L.Rev. 947, 951 n. 23 (1979) (citing laws in Connecticut, Indiana, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Washington). There is nothing in the legislative history which suggests that the Greek Treaty was intended to override these laws. Indeed, during Senate hearings, a State Department legal adviser was questioned about the Treaty's impact on existing state laws. He stated unequivocally that the Treaty would not affect any state laws other than those concerning restrictions on the practice of certain professions by noncitizens. *See 1953 Hearings, supra,* at 4–5.

### B.

■ Strictly construed, Michigan law does not preclude Olympic from exercising its privilege under the Greek Treaty by giving a preference to Greek *citizens* in the hiring of its managerial and technical personnel. The Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. §§ 37.-2101–.2804 (West Supp.1984) states that an employer may not:

> (a) Fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national

origin, age, sex, height, weight or marital status.

*Id.* at § 37.2202(1)(a). Citizenship *per se* is not a classification listed in the Michigan employment discrimination law, and there is no claim by plaintiff as yet that Michigan law would prevent Olympic from hiring, firing or promoting a Greek citizen. To the extent that plaintiff may claim on remand that Greek citizenship and national origin are synonymous and that Michigan law prevents Olympic from giving preference to Greek citizens in management and technical positions, such a claim would conflict with the Treaty and the Treaty would prevail.

In interpreting the Greek Treaty to afford Olympic a narrow privilege to discriminate in favor of Greek citizens, we simply recognize that the Treaty provides Greek companies doing business in the United States and American companies in Greece some freedom to favor their own citizens for managerial and technical positions within the company so as to ensure their operational success in the host country. Plaintiff may object that under the interpretation this Court adopts, Olympic would be free to define "executive personnel" as it wishes and thereby flout labor relations and minimum wage laws. We note, however, that Article XII of the Greek Treaty is enforced in the United States not by Olympic or the Greek government, but in the first instance by the United States Department of State. *See* Immigration and Nationality Act (INA), 8 U.S.C. § 1104 (1982) (defining responsibilities of State Department with respect to issuance of visas). Any Greek citizens Olympic wants to hire for executive positions in the United States must first be legally admitted to the coun-

---

ber of states had laws restricting or banning the employment of aliens by foreign companies doing business within the state. The legislative history of the post-war treaties suggests that both parties deemed the right to utilize the services of their own nationals in managerial, technical, and confidential capacities to be critical. *See Hearing Before a Subcomm. of the Comm. on Foreign Relations of the U.S. Senate on Treaties of Friendship, Commerce and Navigation Between the United States and Colombia, Israel, Ethiopia, Italy, Denmark, and Greece,* 82nd

Cong., 2d Sess. 26 (1952) [hereinafter cited as *1952 Hearing* ] (statement of Robert F. Loree, Chairman, National Foreign Trade Council). "Stimulation of the spirit of respect and trust" for the other party's investment needs was "essential to the establishment of satisfactory business relationships between citizens of the United States and the other countries which are parties to treaties of Friendship, Commerce and Navigation." *1953 Hearings, supra,* at 27 (statement of U. Alexis Johnson, Deputy Assistant Secretary of State for Far Eastern Affairs).

try pursuant to the so-called "treaty trader" section of the INA, 8 U.S.C. § 1101(a)(15)(E)(i) (1982). That provision defines a class of nonimmigrant aliens permitted to enter the United States under treaties of Friendship, Commerce and Navigation. Before a nonimmigrant alien can be issued a treaty trader visa, the State Department is required to certify that he will be "engaged in duties of a supervisory or executive character, or if he is or will be employed in a minor capacity, he has the specific qualifications that will make his services essential to the efficient operation of the employer's enterprise and will not be employed solely in an unskilled manual capacity." *See* 22 C.F.R. § 41.40 (1984), 9 Foreign Affairs Manual, Part II, § 4.40 n. 16 (1975). Thus the issuance of treaty trader visas, and *a fortiori* the ability of Greek companies to hire Greek citizens to fill executive positions under the Greek Treaty, is limited, and is subject to the supervision and control of the State Department. *See* 22 C.F.R. § 41.110–.125 (1984) (outlining procedures for application for and issuance of nonimmigrant alien visas).

Olympic has no license to discriminate against or among non-Greek citizens it hires for positions not covered by the Treaty on the basis of race, sex, national origin, or any of the other factors prohibited by Michigan law. Whether plaintiff has made out a valid claim of age discrimination, or national origin discrimination not protected by the Treaty, involves questions of fact for the District Court to resolve. We therefore remand this issue to the District Court for consideration of plaintiff's age discrimination and national origin claims.

### III.

Plaintiff also appeals the District Court's entry of a summary judgment against him on the claim that his termination violated an implied employment contract under a Michigan common law theory derived from *Toussaint v. Blue Cross and Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980). We agree with the District Judge that *Toussaint* does not supply plaintiff with a cause of action.

In *Toussaint*, the Michigan Supreme Court held that oral representations and written policy statements, ensuring termination only for good cause, can sustain a breach of contract action. *Toussaint*, however, does not alter the longstanding rule in Michigan that an employment contract for an indefinite period is terminable at the will of either party, with or without cause. *See, e.g., Suchdolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 316 N.W.2d 710 (1982). Indeed, the court in *Toussaint* began its analysis by recognizing the presumption that employment relationships are terminable at will. *Id.* at 600, 316 N.W.2d at 885. The court noted:

> Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause. We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedures to that effect, can give rise to rights enforceable in contract.

408 Mich. at 610, 292 N.W.2d at 890. Thus *Toussaint* adds a gloss to the rule that employment contracts are terminable at will, by allowing the at will presumption to be overcome by evidence of oral representations or written policy statements on which the employee based a legitimate expectation that he would be terminated only for cause.

We find no such evidence in this record. Plaintiff testified that he never signed an employment contract with Olympic, Deposition of Jack W. Wickes at 47; that he does not recall ever discussing Olympic's policies with regard to job security, tenure, layoff or discharge, *id.;* that he does not recall that any promises were made to him with regard to these areas, *id.* at 48; that he never received any documents or written versions of company policies on job security or discharge, *id.;* that he had no understanding with the company about his term of employment, *id.* at 49; and that he was never informed during his tenure with Olympic that he had any protection against

layoff, *id.* Plaintiff now asserts that his deposition testimony regarding the absence of an employment contract should not be dispositive because he is not a lawyer. Nevertheless, we cannot excuse plaintiff's failure to come forward with evidence showing the existence of a genuine issue for trial. *See* Fed.R.Civ.P. 56(e) (summary judgments; defense required).

It appears that Olympic made no representations, oral or written, from which plaintiff could derive a legitimate expectation that he could be terminated only for good cause. Therefore, plaintiff cannot maintain a cause of action for breach of an implied employment contract based on *Toussaint.*

For the foregoing reasons, we reverse the District Court's holding on plaintiff's national origin and age discrimination claims and remand those issues to the District Court for further proceedings. We affirm the District Court's entry of a summary judgment against plaintiff on his breach of implied employment contract claim.