Thomas V. MacNAMARA, Appellant,

v.

KOREAN AIR LINES, Appellee.

No. 87–1741.

United States Court of Appeals, Third Circuit.

Argued May 6, 1988.
Decided Dec. 21, 1988.

---

Mitchell A. Kramer (argued), Steven M. Steingard, Ellen F. Kandell, Robert D. Greenbaum, Mitchell A. Kramer & Associates, Philadelphia, Pa., for appellant.

Alan M. Lerner (argued), Jeffrey Ivan Pasek, Theresa M. Kirkpatrick, Cohen, Shapiro, Polisher, Shiekman and Cohen, Philadelphia, Pa., for appellee.

William Bradford Reynold, Asst. Atty. Gen., Jessica Dunsay Silver, Irving Gornstein, Attys. Dept. of Justice, Washington, D.C., for the U.S. as amicus curiae.

Before HIGGINBOTHAM, STAPLETON, and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

In this appeal we must determine the relationship between the employer choice provisions contained in the Treaty of Friendship, Commerce and Navigation, November 28, 1956, United States–Korea, 8 U.S.T. 2217, T.I.A.S. No. 3947 ("Korean FCN Treaty"), and the proscriptive employer choice language of subsequently enacted federal civil rights legislation, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"). We find ourselves in disagreement with the analysis of the district court and will reverse and remand for further proceedings.

### I

Appellant Thomas MacNamara, an American citizen, began working for the appellee Korean Airlines ("KAL") in 1974, after having previously worked for several other airlines. In December, 1977, he was promoted from salesman to district sales manager for Delaware, Pennsylvania and southern New Jersey. On June 15, 1982, MacNamara, then fifty-seven years of age, was dismissed, ostensibly as part of KAL's

reorganization of its United States operations. KAL discharged six American managers nationally, including MacNamara, and replaced them with four Korean citizens. The Korean citizen who replaced MacNamara was a forty-two year old man who previously had been in charge of KAL's Washington office. After exhausting his administrative remedies, MacNamara filed suit against KAL in November, 1982, alleging that his discharge violated Title VII, the ADEA and the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). He complained specifically that KAL had discriminated against him on the basis of race, national origin and age, and additionally that he was entitled to recover because "all of Defendant's American Sales Managers in the United States were replaced by Koreans."

In January, 1983, KAL filed a motion to dismiss MacNamara's complaint on the ground that its conduct was privileged under the terms of the Korean FCN Treaty. The Korean FCN Treaty is one of a series of Friendship, Commerce and Navigation Treaties the United States signed with various countries after World War II. Although initially negotiated primarily for the purpose of encouraging American investment abroad, the Treaties secured reciprocal rights and thus granted protection to foreign businesses operating in the United States. *See generally* Walker, *Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice* 5 Am.J.Comp.L. 229 (1956). The specific provision of the Korean FCN Treaty relied upon by KAL in this case provides as follows:

### ARTICLE VIII

1. Nationals and companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice. Moreover, such nationals and companies shall be permitted to engage accountants and other technical experts regardless of

the extent to which they may have qualified for the practice of a profession within the territories of such other Party, for the particular purpose of making examinations, audits and technical investigations for, and rendering reports to, such nationals and companies in connection with the planning and operation of their enterprises, and enterprises in which they have a financial interest, within such territories.

8 U.S.T. at 2223. KAL argued to the district court that the "of their choice" language in the first sentence of Article VIII(1) gave it the right to employ executives of its own choosing, unhampered by domestic anti-discrimination employment statutes.

In response to KAL's motion, MacNamara, joined by the United States as amicus, claimed that Article VIII(1) secured to a foreign business only the right to select managerial and technical personnel on the basis of citizenship and did not provide a broad exemption from laws such as Title VII and the ADEA which prohibit employment decisions on the basis of race, national origin, or age.

The district court, treating the motion to dismiss as a motion for summary judgment, granted KAL's motion, reasoning that the signatory countries, especially the United States, intended that the Treaty assure foreign corporations of their ability to manage investments in the host country without interference. Consistent with the Treaty's general intent, Article VIII(1)'s unconditional language was drafted specifically to exempt a foreign company's choice as to essential personnel from the operation of domestic employment laws. As a result, the court concluded that Title VII and the ADEA could not be reconciled with Article VIII(1), and in the face of such conflict, the terms of the Treaty controlled. The court, however, limited its holding to employment decisions regarding essential personnel, and to situations involving the favoring of Korean citizens; thus KAL employment decisions not having the effect of favoring Korean citizens would be subject to the ADEA and Title VII.

The district court's decision is consistent with the opinion of the Fifth Circuit Court of Appeals in *Spiess v. C. Stoh & Co. (America)*, 643 F.2d 353 (5th Cir.1981) *vacated on other grounds*, 457 U.S. 1128, 102 S.Ct. 2951, 73 L.Ed.2d 1344 (1982), which considered the scope of the Japanese FCN Treaty. In *Spiess*, American employees of C. Stoh & Company (America) brought a class action against their employer alleging that promotions and benefits were made available to Japanese citizens alone, in violation of federal law. C. Stoh & Company (America), a New York corporation wholly owned by a Japanese Corporation, invoked the protection of Article VIII(1) of the Japanese FCN Treaty, which is identical in relevant part to the Korean FCN Treaty, and moved for dismissal. The district court held that C. Stoh & Company (America) was a United States company for purposes of the Treaty, and thus could not assert the Article VIII(1) rights of Japanese corporations operating in this country. The Court of Appeals reversed, reasoning that the Treaty not only covered the actions of the foreign subsidiary, but provided it with a complete defense as well. The absolute language of Article VIII(1), the court held, fully insulated the company from domestic anti-discrimination laws with respect to the hiring of executives.

The Fifth Circuit Court of Appeals, however, is only one of three federal appellate courts that has considered the issue. Several months before *Spiess*, the Second Circuit Court of Appeals decided *Avigliano v. Sumitomo Shoji America, Inc.*, 638 F.2d 552 (2nd Cir.1981), *vacated on other grounds*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). *Sumitomo* involved a class action against a wholly-owned subsidiary of a Japanese corporation brought by secretaries who alleged that the corporation had a discriminatory policy of filling its management level positions exclusively with male Japanese nationals. The court first concluded, like *Spiess*, that the subsid-

iary could invoke the Japanese FCN Treaty in defense. Nevertheless, in contrast to *Spiess*, the court additionally held that the Treaty did not give the company a broad license to violate American anti-discrimination laws. Rather, the court reasoned, Article VIII(1) was primarily intended to exempt foreign companies from local legislation restricting the employment of noncitizens, and more generally, to facilitate a company's employment of its own nationals. In light of that purpose, the court suggested that the Treaty and Title VII could be reconciled by reference to Title VII's "bona fide occupational qualification" ("BFOQ") exception.[1] Although ordinarily the BFOQ exception is narrowly construed, the Second Circuit Court of Appeals reasoned that interpreting it more broadly in the context of FCN Treaties was warranted by the terms of Article VIII(1) and would give foreign employers reasonable latitude to hire solely nationals for its management positions. In the court's view, a foreign employer exercising its right under Article VIII(1) is sufficiently protected by allowing it to escape liability when it can demonstrate that the employment of its citizens was "reasonably necessary to the successful operation of its business" in the United States. 638 F.2d at 559. With respect to the facts in *Sumitomo*, this meant that the employment decision would have to be justified on the basis of

> the unique requirements of a Japanese company doing business in the United States, including such factors as a person's (1) Japanese linguistic and cultural skills, (2) knowledge of Japanese products, markets, customs, and business practices, (3) familiarity with the personnel and workings of the principal or parent enterprise in Japan, and (4) acceptability to those persons with whom the company or branch does business.

*Id.*

The Supreme Court granted *certiorari* in *Sumitomo Shoji America, Inc. v. Avagli-*

---

1. Title VII provides in pertinent part:
   [i]t shall not be an unlawful employment practice for an employer to hire and employ employees, ... on the basis of his religion, sex, or national origin in those certain in-

stances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise....
42 U.S.C. § 2000e–2(e).

*ano,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed. 2d 765 (1982), and vacated the judgment on the ground that the wholly-owned subsidiary was not a company of Japan so as to come within the coverage of the FCN Treaty. Although the Court expressly declined to interpret the scope of Article VIII(1) of the Japanese FCN Treaty, it nevertheless declared:

> The purpose of the Treaties was not to give foreign corporations greater rights than domestic companies, but instead to assure them the right to conduct business on an equal basis without suffering discrimination based on their alienage.

*Id.* at 187–188, 102 S.Ct. at 2380–81.

The Sixth Circuit Court of Appeals, in *Wickes v. Olympic Airways,* 745 F.2d 363 (6th Cir.1984), decided after the Supreme Court's *Sumitomo* opinion, articulated yet another view of the relationship between anti-discrimination laws and FCN Treaties. Wickes claimed that Olympic Airways, a foreign corporation owned by the government of Greece, fired him on the basis of age and national origin in violation of Michigan's anti-discrimination law.[2] Olympic Airways invoked Article XII(4) of the Greek FCN Treaty, arguing that it provided complete immunity from the state anti-discrimination law.[3] The court rejected Olympic Airways' broad position, reasoning that the Treaty offered only a narrow privilege to give preference to Greek citizens in the hiring of essential personnel. Because the express terms of Michigan's anti-discrimination law did not proscribe employment decisions on the basis of citizenship, the court concluded that the Treaty and the state legislation were not in conflict. The court further recognized, however, that "[t]o the extent that plaintiff may claim on remand that Greek citizenship and national origin are synonymous and that Michigan law prevents Olympic from giving preference to Greek citizens in management and technical positions, such a claim would conflict with the Treaty and the Treaty would prevail." *Id.* at 368.

Because we agree with KAL that MacNamara's replacement was an "executive" within the meaning of Article VIII(1) and that the right "to engage" foreign nationals necessarily includes the right to replace people in MacNamara's position with a foreign national (Section II, *infra* ), we must wrestle with the broader issues discussed in *Spiess, Sumitomo,* and *Wickes.*

■ We agree with the Courts of Appeals for the Fifth and Sixth Circuits that Article VIII(1) goes beyond securing the right to be treated the same as domestic companies and that its purpose, in part, is to assure foreign corporations that they may have their business in the host country managed by their own nationals if they so desire. We also agree with the conclusion of the Sixth Circuit Court of Appeals that Article VIII(1) was not intended to provide foreign businesses with shelter from any law applicable to personnel decisions other than those that would logically or pragmatically conflict with the right to select one's own nationals as managers *because of their citizenship.* Insofar as Title VII and the ADEA proscribe intentional discrimination on the basis of race, national origin,

**2.** Wickes did not properly exhaust his administrative remedies and therefore was barred from bringing analogous federal claims under Title VII and the ADEA.

**3.** The language of Article XII of the Greek FCN Treaty differs from the language of Article VIII(1) of the Korean FCN Treaty. Article XII(4) provides in pertinent part:

> Nationals and companies of either Party shall be permitted to engage within the territories of the other Party ... executive personnel ... and other employees *of their choice* among those legally in the country and eligible to work. Moreover, such nationals and companies shall be permitted to engage, on a temporary basis accountants, and other technical experts, *regardless of nationality* and regardless of the extent to which they possess the qualifications required by applicable laws for the exercise of their duties within the territories of such other Party, for the particular purpose of making examinations, audits and technical investigations for the exclusive account of their employers in connection with the planning and operation of enterprises controlled by the latter or in which they have a financial interest within such territories.

Treaty of Friendship, Commerce and Navigation, Aug. 3 & Dec. 26, 1951, United States–Greece, 5 U.S.T. 1829, T.I.A.S. No. 3057 (as cited in *Wickes,* 745 F.2d at 367) (emphasis added).

and age, we perceive no theoretical or practical conflict between them and the right conferred by Article VIII(1). Thus, for example, we believe that a foreign business may not deliberately undertake to reduce the age of its workforce by replacing older Americans with younger foreign nationals. (Section III *infra.*)

On the other hand, to the extent Title VII and the ADEA proscribe personnel decisions based on citizenship solely because of their disparate impact on older managers, a particular racial group, or persons whose ancestors are not from the foreign country involved, we perceive a potential conflict and conclude that it must be resolved in favor of Article VIII(1). (Section IV, *infra.*)

## II.

We first address MacNamara's contention that his discharge does not trigger the protection of Article VIII(1). More specifically, MacNamara argues first that KAL's Treaty right to *"engage"* executives of its choice does not subsume or incorporate its decision to *terminate* him, and second that he was not an "executive" within the meaning of the Treaty. The district court held against MacNamara on these issues, reasoning that the concept of engagement necessarily included termination, and also concluding, after reviewing MacNamara's job responsibilities, that he performed as an executive. Like the district court, we reject MacNamara's arguments although on somewhat different grounds.

MacNamara fails to appreciate that the employment decision at issue is not simply that of his termination, but additionally involves KAL's act of replacing him with a Korean national. The appropriate focus, therefore, is whether KAL's decision to let MacNamara go *and* reassign his duties to a Korean national is the kind of decision to which Article VIII(1) applies. More importantly, because KAL's defense is that Article VIII(1) protects its selection of the Korean national, the relevant inquiry involves whether MacNamara's *replacement* was both "engaged" by KAL and served as an "executive" under the terms of the Treaty.

From that proper perspective, MacNamara's arguments are not persuasive.

■ First, MacNamara suggests that we adopt as the appropriate definition of "engage", "to obtain or contract for the services of: employ." *Webster's II New Riverside University Dictionary* 433 (1984). Even if we accept *arguendo* such a narrow meaning of engage, KAL certainly obtained the services of MacNamara's replacement, Mr. Wan Gin Chung. Therefore, KAL's decision to transfer MacNamara's job responsibilities to a Korean national plainly involved engaging an employee of its choice. MacNamara further insists, however, that "even if KAL has the right to hire whomever it chooses as 'executives,' it does not have the right to fire with impunity once it has made a selection." Thus, MacNamara contends that Article VIII(1) does not protect any personnel decision involving engaging a foreign national as an executive if its effect is to terminate the employment of another. We conclude, however, that the right of a foreign business under Article VIII(1) to engage the services of its own citizens as executives was intended to include the right to engage them as replacements for existing personnel. A contrary reading of Article VIII(1) would tend to freeze a foreign business' initial management structure and discourage any experimentation with host country executive personnel. We are confident that the drafters of the Treaty did not intend such a result.

■ We also reject MacNamara's contentions that his status as an executive is the appropriate inquiry and that there is a material dispute of fact on that issue. The right secured by Article VIII(1) is the right to engage executive personnel of one's choice and we believe the relevant inquiry is whether MacNamara's responsibilities were reassigned to an "executive" within the meaning of that Article. MacNamara's responsibilities were reassigned to Mr. Wan Gin Chung. It is undisputed that Mr. Chung entered and remained in the United States pursuant to an E–1 "treaty trader" visa which is granted exclusively to foreign employees who perform duties of a supervi-

sory or executive character,[4] and that Mr. Chung, following the reorganization, served as sales manager for a region extending from Pennsylvania to Florida. We agree with the district court that the treaty trader provisions of the Immigration and Nationality Act were enacted to complement the FCN Treaties and that the government's decision granting entry to Mr. Chung as an E–1 treaty trader is strong evidence of his "executive personnel" status. Given that decision and the other uncontradicted evidence regarding Mr. Chung's responsibilities,[5] we conclude that the record establishes him as an executive for purposes of Article VIII(1).

MacNamara argues, however, that even if Mr. Chung is considered an "executive" he is so by virtue of responsibilities other than, or in addition to, the ones received from MacNamara because MacNamara's job did not entail "executive" duties. We conclude, however, that the suggested approach of fragmenting the responsibilities of a "chosen" executive and second-guessing whether they are sufficiently "executive" is inappropriate. The focus must be on the overall responsibility of the "chosen" executive. In a situation of this kind, if a foreign business decides that the responsibilities of the individual replaced are such that they require the attention of a foreign national "executive," that is sufficient.[6]

In sum, we find that the reassigning of MacNamara's job responsibilities to Mr. Chung involved KAL's engaging an executive of its choice within the meaning of Article VIII(1), and as such we now turn to the substantially more complex issues presented in this case.

### III.

Because previous treaties failed to protect businesses from discriminatory treatment in foreign markets, and consequently inhibited investment abroad, the general content of the modern FCN Treaties was guided by the principle of equality of treatment. Herman Walker, a primary architect of the FCN Treaties, explained:

> Treaties for investment purposes deal with the basic legal conditions which influence the degree to which potential investors are willing to venture their capital in undertakings in a foreign land. They aim, on a joint consensual basis, to establish or confirm in the potential host country a governmental policy of equity

---

**4.** The Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1101, *et seq.* ("INA"), authorizing treaty trader entry, provides in pertinent part:

> [A]n alien [is] entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national, and the spouse and children of any such alien if accompanying or following to join him: (i) solely to carry on substantial trade, principally between the United States and foreign state of which he is a national; or (ii) solely to develop and direct the operations of an enterprise in which he is invested, or of an enterprise of which he is actively in the process of investing, a substantial amount of capital.

8 U.S.C. § 1101(a)(15)(E). More specifically, according to the regulations of the State Department, which is responsible for implementing the INA:

> An alien shall be classifiable as a nonimmigrant treaty trader if he establishes to the satisfaction of the consular officer that he qualifies under the provisions of section 101(a)(15)(E)(i) of the Act and that: (1) He intends to depart from the United States upon the termination of his status; and (2) if he is employed by a foreign person or organization having the nationality of the treaty country which is engaged in substantial trade as contemplated by section 101(a)(15)(E)(i), *he will be engaged in duties of a supervisory or executive character,* or, if he is or will be employed in a minor capacity, he has special qualifications that will make his services essential to the efficient operation of the employer's enterprise and will not be employed solely in an unskilled manual capacity.

22 C.F.R. § 41.40(a)(1987) (emphasis added).

**5.** MacNamara complains about not having received responses to outstanding discovery prior to his being required to respond to the motion for summary judgment, but none of this discovery was directed to the responsibilities of Mr. Chung.

**6.** Mr. Chung was eventually replaced by Mr. Hong, another Korean citizen and E–1 treaty trader, and the district court's opinion focused on the status of Mr. Hong rather than that of Mr. Chung. While our analysis differs, the record demonstrates that both were executive personnel.

and hospitality to the foreign investor. This means, above all, assurance that the enterprise and property of the alien will be respected and that he will be accorded equal protection of the laws alike with citizens of the country. This fundamental idea, then, is the raw material from which the variegated content of the treaties is elaborated.

Walker, *Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice,* 5 Am.J. Comp.L. 229, 230 (1956).[7] As derived from that equality principle, the standard of "national treatment" primarily determined the functional rights accorded foreign businesses under the FCN Treaties. Walker explained:

> Moreover, the basic rule to govern the conduct of such activities has long since been settled, in United States treaty practice, as "national treatment": that is, equality of treatment as between the alien and the citizen of the country. The former thus is entitled freely to carry on his chosen business under conditions of non-discrimination, and to enjoy the same legal opportunity to succeed and prosper on his merits as is allowed citizens of the country.

*Id.* at 232.

Although national treatment was the predominant standard, two other kinds of protection were established in FCN Treaties. When the signatory nations were unwilling to grant national treatment with respect to some issues, the Treaty afforded a lesser standard of protection, "most-favored-nation treatment," or treatment no less favorable than that under which the most privileged foreign company operated. *Sumitomo,* 457 U.S. at 188 n. 18, 102 S.Ct. at 2381 n. 18. Alternatively, the Treaty also provided for absolute or non-contingent standards that gave foreign employers a certain specified protection without regard to whether the same protection was provided to host country businesses. *Id.*

■ With the foregoing understanding of the structure and purpose of FCN Treaties in general, we now examine Article VIII(1) of the Korean FCN Treaty, in particular. We note initially that our role in treaty interpretation is limited to ascertaining and enforcing the intent of the treaty parties. *Sumitomo,* 457 U.S. at 185, 102 S.Ct. at 2379–80. The literal meaning of a treaty's language should control unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Id.* at 180, 102 S.Ct. at 2377 (quoting *Maximov v. United States,* 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963)).

Article VIII(1) of the Korean FCN Treaty on its face is absolute and ostensibly self-defining. Neither KAL nor MacNamara, however, suggest that a literal interpretation of the provision is an appropriate one. Both parties agree, for example, that the right to "executive personnel ... of their choice" does not entitle a foreign company operating in the United States to select among American citizens on the basis of their age, race, sex, religion, or national origin, although Article VIII(1) on its face would permit such discrimination. Because the signatories had no reason to bargain for the right to discriminate within the host country's labor pool, a literal interpretation can not be reconciled with the Treaty's intent and negotiating history.

The parties also agree that Article VIII(1) goes beyond assuring national treatment.[8] Whatever the rules governing the selection of executive personnel by host

---

7. Walker served as Advisor on Commercial Treaties at the State Department and according to it was responsible for formulating the general structure of the postwar FCN Treaties. *Sumitomo,* 457 U.S. at 181 n. 6, 102 S.Ct. at 2377–78 n. 6 (citing Department of State Airgram A–105, dated Jan. 9, 1976).

8. Courts have consistently reached this conclusion based on both the absolute character of the language used in Article VIII(1) as contrasted with other portions of the Treaty and the legislative history demonstrating that the provision was intended to protect foreign businesses from "percentile laws." *See, e.g., Wickes,* 745 F.2d at 367; *Spiess,* 643 F.2d at 360. A construction of Article VIII(1) that would limit its effect to national treatment would not provide such protection. *See discussion, infra,* at 1145.

country companies, foreign businesses are granted the right to engage "executive personnel ... of their choice." Moreover, the parties further agree that this right includes the right to discriminate on the basis of citizenship; thus foreign businesses clearly have the right to choose citizens of their own nation as executives *because they are such citizens*. The parties part company, however, on whether this right to discriminate on grounds of citizenship is the full extent of the protection conferred by Article VIII(1).

MacNamara contends that the only right granted by Article VIII(1) is the right to choose one's own citizens *because of their citizenship*. As a result, according to Mac-Namara, Article VIII(1) does not confer the right to choose one's own citizen over a citizen of the host country because of race, sex, or age. KAL, on the other hand, reads Article VIII(1) to confirm more than the right to choose one's own citizens *because of their citizenship;* it finds in the provision an immunity from Title VII and the ADEA for any decision on executive personnel that favors a citizen of one's own nation. Thus, KAL argues in effect that it has the right under Article VIII(1) to choose a citizen of Korea for an executive position *for any reason* and a concomitant right to be free from judicial scrutiny of its subjective motivation in choosing the Korean citizen. Accordingly, KAL urges us to hold, as did the district court, that a decision by a foreign business to engage an executive from its own country cannot be the subject of a Title VII or ADEA suit.

While we find some merit in KAL's position, we conclude that it paints with far too broad a brush. The target of Article VIII(1) was legislation that forced foreign employers to hire host country personnel. Because its objective was thus limited, the text and the relevant history indicate that the negotiators understood that employment decisions regarding the personnel described in Article VIII(1) would be free of domestic laws utilizing citizenship as a criterion, but would be subject generally to other legally imposed criteria. Since Article VIII(1) can be construed in a manner which is both supported by its text and history and consistent with Title VII's and the ADEA's proscriptions of intentional race, national origin, and age discrimination, we cannot accept KAL's position. *See e.g., Whitney v. Robertson,* 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888) (courts must try to reconcile competing legislation so as to effectuate the purposes of both while not sacrificing the terms of either).[9]

■ Our review of the history of the negotiations leading up to the FCN Treaties [10] has led us to the same conclusion as that of the *Wickes* court:

The post-World War II Friendship, Commerce and Navigation treaties were negotiated in a period characterized by so-called "percentile" restrictions which required American companies operating abroad to hire a certain percentage of citizens of the host country. These restrictions were thought to have the effect of inhibiting American companies operating abroad from hiring the people in whom they had the greatest confidence.... The legislative history of the post-war treaties suggests that both parties deemed the right to utilize the services of their own nationals in managerial, technical, and confidential capacities to be critical.

745 F.2d at 367–68 n. 1 (citations omitted). In short, this history persuasively demonstrates that the target of Article VIII(1) was domestic legislation that discriminated

---

9. Judge Higginbotham does not agree that Article VIII(1) permits courts to look behind a company's decision to hire an executive of its own nationality to scrutinize the company's subjective motivations.

10. *See,* in particular, Foreign Service Despatch No. 144 from the U.S. Embassy, The Hague, to Dept. of State, Aug. 16, 1954 ("... the big problem to which [Article VIII(1)] was addressed was so-called percentile legislation ..."); Foreign Service Despatch No. 914 from the U.S. Embassy, Brussels, to Dept. of State, Mar. 11, 1955 ("... the abuse [Article VIII(1)] was designed to correct, namely 'percentile' laws ..."); Foreign Service Despatch No. 2075 from the U.S. Embassy, Paris, to Dept. of State, May 7, 1959 (U.S. negotiators worried about French percentile laws).

on the basis of citizenship and that the provision was necessary for the limited purpose of securing to foreign investors the freedom to place their own citizens in key management positions, thus facilitating their operational success in the host country.

By contrast, the history of these negotiations is barren of any suggestion that Article VIII(1) was intended to achieve anything other than the right to utilize one's own citizens in the capacities specified and KAL has offered no persuasive reason why the parties would have been motivated in the 1950's to negotiate for an exemption from laws prohibiting race, national origin, or age discrimination. To the contrary, the text of the Article itself reflects an understanding on the part of the negotiators that personnel decisions would remain subject to domestic legislation not inconsistent with the right to discriminate in favor of one's own citizens. The second sentence of Article VIII(1) guarantees to foreign businesses the right to engage their own people as accountants and other technical experts regardless of the extent to which they may have satisfied the professional qualifications required under domestic law.[11] If the first sentence had been intended to give a foreign employer the right to engage a citizen of its own country without regard to domestic laws that would otherwise impinge on that decision, the second sentence would have been unnecessary. Its presence suggests that the negotiators intended a foreign employer's decision to be unaffected by laws that discriminated on the basis of citizenship but nevertheless be subject to other domestic laws, excepting only those specifying professional qualifications.

The district court and KAL reason that, had the signatories intended to subject key employment decisions to anti-discrimination

legislation, Article VIII(1)'s unconditional language could have been qualified by a clause as adopted subsequently in the Pakistani FCN Treaty: "[N]ationals and companies of either party shall be permitted, *in accordance with the applicable laws*, to engage, within the territories of the other party ... executive personnel ... of their choice." Treaty of Friendship and Commerce, Nov. 12, 1959, United States–Pakistan, Art. VIII, 12 U.S.T. 110–114, T.I.A.S. 4683 (emphasis added). Moreover, the district court noted that the United States expressly rejected a Uruguayan proposal to modify the "of their choice" language with the clause, "... discrimination against nationals of the other party shall be avoided, and without prejudice to laws designed to protect their employment." Dept. of State Airgram No. 385 from U.S. Embassy, Montevideo, to the Dept. of State, Nov. 8, 1949.

We find the reasoning of the district court and KAL unpersuasive. As explained by the United States negotiators, "local laws" clauses such as contained in the Pakistani FCN Treaty and as deleted in the Uruguayan FCN Treaty were to be avoided because they would enable countries to pass exactly the kind of legislation that United States investors feared—laws limiting the employment of United States citizens or requiring the employment of locals. Such domestic laws, although ostensibly applicable to local and foreign companies alike, would impact the operation of the foreign company specially. Foreign companies alone would be deprived access to the services of their own nationals in whom presumably they had the greatest confidence.[12]

Thus, the negotiation histories as a whole clearly reveal that, as far as American negotiators were concerned, in order to assure American investors of the right to hire

---

**11.** The second sentence, like the first, is not literally limited to decisions involving citizens of the foreign employer's country. As we have noted, however, neither side argues that Article VIII(1) was intended to govern decisions that do not involve such citizens.

**12.** *See, e.g.,* Foreign Service Despatch No. 914 from the U.S. Embassy, Brussels, to Dept. of State, Mar. 11, 1955 ("The Belgians then pro-

posed to clarify the wording [of Article VIII(1) ] by inserting a local laws clause; but the U.S. side replied that such a broad exception would leave the way open for precisely the abuse the sentence was designed to correct, namely, 'percentile' laws and other governmental fiats circumscribing freedom of choice of high-grade personnel on a purely nationality basis.").

qualified Americans in executive positions, and thus to overcome local legislation precluding that right, Article VIII(1) had to be drafted in absolute terms. Yet, that absolute language was intended to confer no greater right than an employer's freedom to choose the nationality of its executive labor pool.

We believe it was these considerations that prompted the Supreme Court's observation in *Sumitomo* that the purpose of the Treaty was not to give foreign corporations greater rights than domestic corporations but rather to free them from "discrimination based on their alienage." 457 U.S. at 187–188, 102 S.Ct. at 2381. This observation is consistent with MacNamara's position, but not with that of KAL. If Article VIII(1) is read as protecting a foreign corporation's right to employ its own citizens, it is thereby guaranteed the same access to its own citizens as domestic employers have to theirs. If it is interpreted to confer an immunity from Title VII and the ADEA in connection with personnel decisions involving citizens of the foreign company's country, it would give to foreign businesses a right not possessed by domestic employers.

Finally, we note that our reading of Article VIII(1) is consistent with that of the State Department which is the agency that enforces the FCN Treaty. The Supreme Court declared in *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961), that "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." In its amicus brief, the State Department interprets Article VIII(1) as merely "creat[ing] a limited privilege to hire noncitizens, not a broad exemption from laws that prohibit discrimination on grounds unrelated to citizenship." Accordingly, the government urges this court to reverse the judgment of the district court insofar as it held that KAL had the "right to fire MacNamara and replace him with a Korean treaty trader, even if that decision was based on race, national origin, or age." Because the available Treaty history supports the State Department's position, we accord appropriate weight to that interpretation.[13]

■ Our conclusion that Article VIII(1) was intended to do no more than entitle a foreign business to favor personnel and prospective personnel on the basis of citizenship does not end the matter, however. KAL's most plausible argument is that even if the intent of Article VIII(1) is so limited, the operation of Title VII and the ADEA nevertheless cannot be reconciled with the Treaty right. Before addressing this contention, we note our agreement with KAL that in the absence of evidence suggesting Congress intended subsequent legislation to affect existing treaty rights, and in the event the enactments conflict, the Treaty must prevail. *See, e.g., McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963); *Spiess*, 643 F.2d at 356. Moreover, we agree with KAL that there is no evidence that Congress intended to abrogate the Article VIII(1) right in any way when it enacted Title VII and the ADEA. We perceive considerably less conflict, however, than does KAL.

[8] There is no logical conflict between Article VIII(1), as we have interpreted it, and Title VII or the ADEA insofar as the latter proscribe intentional discrimination on the basis of race, national origin, and age. Contrary to the apparent assumption of the Second Circuit Court of Appeals in *Sumitomo*, national origin discrimination and citizenship discrimination are distinct phenomena.[14] Indeed, the Supreme Court

---

**13.** Contrary to the apparent understanding of the district court, we perceive no conflict between the position of the United States government and that of the Korean government.

**14.** In *Sumitomo,* the Court of Appeals apparently perceived a conflict between Article VIII(1)

and Title VII's proscription of intentional discrimination since it suggested that the two could only be reconciled by a modified application the BFOQ exception and since resort to the BFOQ is triggered only upon a finding of intentional discrimination. Because we perceive no conflict, we need not rely on a watered down ver-

held in *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336–37, 38 L.Ed.2d 287 (1973), that Title VII was not intended to bar discrimination on the basis of citizenship, reasoning that, "the term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." Inherent in the Court's reading of Title VII and its history, is a Congressional determination that a trier of fact can distinguish national origin discrimination from citizenship discrimination and, accordingly, that courts can impose liability on the basis of the former without imposing it for the latter.

KAL stresses the economic burden that will result from requiring foreign businesses to defend in court the motivation behind their personnel decisions, and also expresses concern about the likelihood of confusion or local prejudice on the part of factfinders. It argues that these concerns will have the effect of discouraging foreign businesses from exercising their Article VIII(1) right and, therefore, will ultimately discourage foreign investment in the United States contrary to the intent of the Treaty. These concerns are certainly not fanciful and it is reasonable to expect that they may have some impact on the decisionmaking of foreign businesses operating in the United States. On the other hand, defending personnel decisions is a fact of business life in contemporary America and is a burden that the domestic competitors of foreign enterprise have been required to shoulder.

Moreover, while we recognize that factfinders can and do err from time to time, the relevant issue is whether there is reason to believe that the instances of error will be materially greater in Title VII and ADEA cases where a foreign employer has exercised its Article VIII(1) right than in other cases filed under those statutes. Where a foreign business has chosen one of its own citizens as an executive because he or she is such a citizen, we think the plaintiff is no more likely to succeed than any other employment discrimination plaintiff in convincing the trier of fact that the decision was made for some different, impermissible reason.

■ For these reasons, we conclude that there is no logical or pragmatic conflict between the right of foreign businesses under Article VIII(1) to engage their own citizens as managers because of their citizenship and the right of employees in the United States to be free from intentional race, age, and national origin discrimination.[15] As a result, we hold that the district court erred in concluding that MacNamara's disparate treatment claims could not go forward.

## IV.

■ Having concluded that KAL cannot purposefully discriminate on the basis of age, race, or national origin, we now turn to the most difficult aspect of this case. To this point we have confined our analysis to liability for *intentional* discrimination.

sion of the BFOQ defense. We note, however, that when the issue is whether the use of foreign managers is reasonably necessary to the success of a foreign business in the United States, which is the trier of fact's inquiry under the Second Circuit's approach, the foreign employer faces a different, and considerably more difficult, burden than when the issue is simply whether it favored its own citizens because they were such citizens, which is the trier of fact's inquiry under our analysis.

15. We also conclude that even in the context of so-called "mixed motive" cases, there is no logical conflict between the right conferred on foreign businesses by Article VIII(1) and liability for intentional race, national origin, and age discrimination under Title VII and the ADEA. This court has held that, even when a plaintiff

can prove that an impermissible consideration was a substantial or motivating factor in an employer's disputed conduct, the plaintiff will not prevail unless he or she can further show that "but for" the impermissible factor, the challenged conduct would not have occurred. *Lewis v. University of Pittsburgh*, 725 F.2d 910, 914–16 (3rd Cir.1983). This rule in the context of the present case means that KAL can be found liable only if MacNamara can establish that but for race, national origin, or age, KAL would not have dismissed him. Thus, even where a desire to favor one's own citizens may have played some role in a decision to replace an employee, there can be no liability unless the same decision would not have been made absent the race, national origin, or age of the replaced individual.

The reach of Title VII and the ADEA, however, extends beyond intentionally discriminatory employment policies to those practices fair in form, but discriminatory in operation. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Accordingly, Title VII and ADEA liability can be found where facially neutral employment practices have a discriminatory effect or "disparate impact" on protected groups, without proof that the employer adopted these practices with a discriminatory motive. *See, e.g., Watson v. Fort Worth Bank & Trust*, 487 U.S. ——, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). As we have noted, MacNamara complains because KAL has replaced all its "American" sales managers with "Koreans." This, together with counsel's comments at oral argument, suggests that he is challenging the practice of favoring Korean nationals on the ground that it has the *effect* of discriminating against others on grounds of race or national origin. *See, e.g., Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). In establishing this kind of disparate impact liability, parties generally rely exclusively on statistical evidence of disproportionate effect. As the Supreme Court recently explained in *Watson*, 108 S.Ct. at 2784–2785: "[t]he factual issues and the character of the evidence are inevitably somewhat different when the plaintiff is exempted from the need to prove intentional discrimination. . . . The evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." (citations omitted).

The fact that empirical evidence can satisfy the substantive standard of liability would pose a substantial problem in disparate impact litigation for corporations hailing from countries, including perhaps Korea, whose populations are largely homogeneous. Because a company's requirement that its employees be citizens of the homogeneous country from which it hails means that almost all of its employees will be of the same national origin and race, the statistical disparity between otherwise qualified non-citizens of a particular race and

national origin, and citizens of the foreign country's race and national origin is likely to be substantial. As a result, a foreign business from a country with a homogenous population, by merely exercising its protected Treaty right to prefer its own citizens for management positions, could be held in violation of Title VII. Thus, unlike a *disparate treatment* case where liability cannot be imposed without an affirmative finding that the employer was not simply exercising its Article VIII(1) right, a *disparate impact* case can result in liability where the employer did nothing more than exercise that right.

For this reason, we conclude that disparate impact liability under Title VII and the ADEA for a foreign employer based on its practice of engaging its own nationals as managers cannot be reconciled with Article VIII(1). Accordingly, we hold that such liability may not be imposed.

In concluding that Title VII and ADEA liability based on disparate impact, and not disparate treatment, conflicts with Article VIII(1), we are mindful that the statistical evidence supporting a claim of disparate impact often resembles that used to help establish disparate treatment. *See, e.g., Green v. USX Corporation*, 843 F.2d 1511 (3d Cir.1988). Although in the area of statistical evidence our conclusion is admittedly more difficult, we nevertheless believe that, where the empirical disparity is explainable on the basis of a company's exercise of its Article VIII(1) rights, the likelihood of an erroneous finding that the employer intentionally discriminated on a basis other than citizenship is slight. As a result, unlike our conclusion with respect to disparate impact, we are unable to perceive a theoretical or pragmatic inconsistency between, on the one hand, the substantive standard establishing disparate treatment liability and, on the other hand, a recognition of Article VIII(1) rights.

With respect to disparate impact liability, we hold that MacNamara may not proceed with any claim that KAL violated Title VII by replacing its Caucasian American sales managers with Koreans without regard to its subjective intent.

v.

The summary judgment entered in KAL's favor will be reversed and the case will be remanded for further proceedings consistent with this opinion.