Harry D. WEEKS, Plaintiff–Appellant,

v.

SAMSUNG HEAVY INDUSTRIES COMPANY, LIMITED, Samsung America, Incorporated, an Illinois corporation, Samsung Shipbuilding & Heavy Industries Company, Limited, et al., Defendants–Appellees.

Harry D. WEEKS, Plaintiff–Appellant,

v.

SAMSUNG HEAVY INDUSTRIES COMPANY, LIMITED, formerly known as Samsung Shipbuilding and Heavy Industries Company, Limited, a Republic of Korea corporation, Samsung America, Incorporated, and Samsung Construction Equipment Company, a division of Samsung America, Incorporated, Defendants–Appellees.

Nos. 96–2827, 97–1857.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1997.

Decided Sept. 26, 1997.

Michael L. Flynn (submitted on brief), Downers Grove, IL, Torquil R. Olson (argued), Hinsdale, IL, for Plaintiff–Appellant.

Andrew J. Boling, Michael A. Pollard (argued), Peter J. Mone, Nam H. Paik, Baker & McKenzie, Chicago, IL, for Defendants–Appellees in case No. 96–2827.

Andrew J. Boling, Peter J. Mone, Baker & McKenzie, Chicago, IL, for Defendants–Appellees in case No. 97–1857.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Plaintiff–Appellant Harry D. Weeks filed suit against Samsung Heavy Industries Co., Ltd., (hereinafter "SHI"),[1] Samsung America, Inc., and Samsung Construction Equipment Co., alleging racial and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Counts I and II); retaliatory discharge in violation of Title VII (Count III); breach of verbal hiring promise (Count IV); promissory estoppel (Count V); and fraud and misrepresentation (Count VI). Weeks' claims arose from his employment with SHI, and stemmed from his belief that SHI engaged in discriminatory employment practices and made numerous fraudulent misrepresentations to Weeks. The district court granted summary judgment in favor of SHI on all counts. In cause No. 97–1857, the district court imposed costs in the amount of $18,952 in favor of SHI. Weeks now appeals from the district court's grant of summary judgment in favor of SHI in No. 96–2827 and from the district court's imposition of costs in No. 97–1857. We affirm.

## Background

SHI is a Korean corporation with its principal place of business in Korea. Harry D. Weeks, an American citizen, began working for SHI on March 18, 1991, as SHI's National Sales Manager for North America. At that time, Weeks was the only salesperson hired by SHI and was responsible for covering all of North America. Weeks' employment with SHI was negotiated exclusively with Chang Il Kim ("C.I. Kim"), who was the general manager of SHI's Chicago office at that time. On March 18, 1991, Weeks received a letter from C.I. Kim, on letterhead from SHI's Chicago office, setting forth the terms of Weeks' employment with SHI. The letter indicated that the first three months of Weeks' employment with SHI would be on a probationary basis, which would give Weeks

1. Samsung Shipbuilding & Heavy Industries, Co., Ltd., a Korean corporation with its principal place of business in Seoul, Korea, changed its name in 1991 to Samsung Heavy Industries Co., Ltd. Samsung America, Inc. is a New York corporation with its principal place of business in New Jersey. Samsung Construction Equipment Company was created in 1993 as a division of Samsung America, Inc., and has its principal place of business in Illinois. Weeks was employed by SHI, but because it is more convenient for our purposes, we will collectively refer to all Defendants as SHI throughout this opinion.

"the opportunity to decide whether the job suit[ed him] and [would] give[ ] SHI the opportunity to determine whether [Weeks was] the right person for the job." The letter also indicated that the three-month probationary period could be extended at the sole discretion of SHI. After the probationary period was over, Weeks' performance was to be reviewed, and, if it was satisfactory, Weeks would obtain the status of a "regular employee." Weeks was not guaranteed any fixed period of employment with SHI as was clearly indicated by the following paragraph, spelled out in all capital letters in the March 18 letter:

YOUR EMPLOYMENT WITH SHI SHALL AT ALL TIMES BE ON AN AT-WILL BASIS. YOUR EMPLOYMENT WITH SHI MAY BE TERMINATED AT ANY TIME UPON SHI'S SOLE DISCRETION. THIS CONDITION MAY NOT BE MODIFIED EXCEPT BY SPECIFIC WRITTEN INSTRUMENT EXECUTED BY THE OFFICE MANAGER OF SHI'S CHICAGO BRANCH.

The letter stated that Weeks' salary would be $6,250 per month, or $75,000 per year. A one-page attachment to the letter entitled "Job Description" listed seven duties for Weeks' position. Included on the list was "1. All the works as National Sales Manager." At the time Weeks was hired, he was the first and only "National Sales Manager" hired by SHI in North America.

On June 17, 1991, C.I. Kim sent Weeks a written memo informing him that his probationary period would be extended by three months until September 18, 1991. Attached to the June 17 memo was a revised job description which was similar to the March 18 job description except that the reference to performing "all the works as National Sales Manager" was no longer included. In place of the reference was "8. Any work, especially provided by the company, related with Sales & Marketing as Sales Manager." C.I. Kim testified that he did not orally inform Weeks that his title was no longer "National" Sales Manager. During the second probationary period, Weeks and SHI negotiated terms for relocating Weeks and his family from Virginia to Chicago. Also during this period, C.I. Kim advised B.T. Kim, a manager in Korea, that he believed

Weeks should be sent to Korea to see "Samsung's advancement/vision, and let him decide whether he wants to work for Samsung."

Weeks was interested in changing the structure of SHI's operations in North America to make it more consistent with the typical structure and organization of American companies. Between June 1991 and January 1992, Weeks came up with a marketing plan which would divide SHI's North American territory into three regions, each having its own regional sales manager. Pursuant to this plan, Weeks would supervise the regional sales managers and have no direct sales responsibilities. In a December 4, 1991 memo, Weeks requested the hiring of more sales managers. He wrote, "C.I. Kim—I have no idea how we can possibly continue to put off all of these dealers who are now saying they are ready to proceed. *When* can I begin adding the necessary staff to take advantage of the most serious inquiries???" On January 21, 1992, C.I. Kim responded with an "Announcement" of the following changes in SHI's internal operating structure:

Although one person has been in charge of the sales and marketing department, this department will be divided into three territories in order to reduce the workload: West, Southeast and West Central–Northeast. Each territory will have one individual who will be in charge of and be responsible for such territory. The head of each territory shall report on operations directly to Chang Il Kim, the Manager of the Oak Brook Terrace office. ·

Harry D. Weeks will be in charge of the West Central–Northeast territory. Harry Weeks shall coordinate and ensure that all necessary sales strategies and financing programs of SHI are properly implemented.

SHI will appoint an individual to be in charge of all three territories for the sales and marketing department whenever it believes that such an appointment is necessary from a business standpoint.

Weeks remained stationed in Chicago, and his compensation, office and other amenities did not change as a result of the restructuring.

On January 21, 1992, Weeks, John Johnson, and John Krett, three North American managers, sent a memo to Y.M. Kim, the Senior Executive Managing Director in Korea, expressing discomfort and concern with the restructuring, and informing the Korean operation of what was occurring in Chicago. The managers had just returned from the American Equipment Dealers' national convention, where they had explained SHI's organizational structure to prospective dealers in an attempt to gain new business for SHI. The January 21 memo explained that because they had not known about the restructuring when they represented SHI at the convention in over thirty-five presentations, they felt that they "clearly misrepresented [themselves] as well as Samsung." The memo continued, "In America this is against the law. We can be sued personally as well as corporately." The memo also expressed the view that the restructuring was not a plan that would have success or had worked in the past for American equipment manufacturers. The memo informed upper management in Korea that the three American managers felt they had been misled by C.I. Kim during their initial interviews, and it stated that C.I. Kim "promised top management positions to all of us during our initial interview." The memo also accused C.I. Kim of being an "inexperienced, egotistical manager who has no experience or knowledge of the construction equipment market." The memo concluded, "If Samsung is to truly be a world-class manufacturer, it must rely on local management of each country it does business in. We respectfully request that you give this matter your attention before everything that we have built this last year is destroyed."

On January 24, 1992, Weeks sent a memo to American management, including C.I. Kim, explaining his view that North America needed to be divided into territories and that the overall structure needed to be coordinated and administered by one person—a North American Sales Manager. Weeks wrote:

> I have tried to explain that the North American Sales Manager position is what I thought the position was that I was being hired for by Samsung Heavy Industries. I also now better understand the corporate structure at Samsung Heavy Industries.

> In our discussions with you we tried to explain the need for Samsung to present itself in North America as a *Westernized* company. This is the only way to gain acceptance in this market.

Weeks' memo also expressed his belief that the necessary support for new field people could only come from an "American" Sales Manager.

On February 6, 1992, in response to the American managers' memo to the Korean executives, C.I. Kim sent letters to Weeks, Johnson, and Krett. He admonished them for sending the memo to Korea without first obtaining his approval, which, he advised, constituted a violation of "company policy." C.I. Kim informed all three that in the future, failure to adhere to company policy could subject them to disciplinary action, including termination. C.I. Kim's letter to Weeks also stated:

> In accordance with the announcement that was circulated to you on January 21, 1992, SHI intends that the Sales Department will be divided into three territories. Each territory will have one individual who will be in charge of and be responsible for such territory. The head of each territory shall report on operations directly to me. This is SHI policy, and as such, must be adhered to by you.

On February 13, 1992, Weeks responded to C.I. Kim that he would be interested in being assigned to the Southern Territory. He stated, "Per our discussions, give this consideration as I know many of the Southern dealers and it would remove me from what has become a very unpleasant situation for me in our Chicago office." Weeks also wrote, "You have instructed me to tell our existing and new potential dealers that my position with the company is unchanged. I have a very serious moral and ethical problem with this position." On February 24, 1992, C.I. Kim replied to Weeks that he

> at no time, gave [Weeks] such instructions. I did state that your responsibilities will continue to be the same as they have been in the past until we hire new managers for the Sales and Marketing Department. Your essential job functions have not changed; only the geographic boundaries

within which you are to perform these duties have been altered due to our realization that one person is not enough to handle our increasing volume of business.

On February 3, 1992, Weeks had filed a complaint of discrimination with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights under both Title VII of the Civil Rights Act of 1964 and under the Age Discrimination in Employment Act of 1967. Weeks alleged that he had been discriminated against on the basis of his race, national origin, and age when he was demoted from the position of Sales Manager of North America to a sales representative. The charge also centered on Weeks' allegations that he had been replaced by a younger, less-qualified Korean employee, Sung Ho Lee ("S.H.Lee"), and that S.H. Lee was being groomed for the position for which Weeks was initially hired. The charge was forwarded to SHI on approximately February 12, 1992.

S.H. Lee is a Korean citizen who entered the United States on an E–1 visa. S.H. Lee began working for SHI in Korea in 1983, and was transferred to the United States in 1989. He was assigned the position of administration manager of the Chicago office of SHI in approximately December 1991, and he had primary responsibility for coordinating import and export matters with SHI's home office in Korea. S.H. Lee was able to read, write, and speak Korean, which aided him in his duties because most of the communication between the Korean and the Chicago offices were conducted in Korean. Affidavits filed by two regional sales managers for SHI stated that S.H. Lee never had any managerial or supervisory responsibility over them, and that he was not the "National Sales Manager." In 1994, SHI hired an American citizen to supervise the regional sales managers.

On February 28, 1992, C.I. Kim sent a memo to Weeks commenting on Weeks' diminished working hours; he felt Weeks was working less than the regular hours of 8:30 to 5:30. C.I. Kim asked Weeks to maintain regular business hours. Weeks responded by memo on the same day that he would resume regular business hours, and that he had not been keeping regular hours because he, "as well as the other managers and staff people, [had] been awaiting your re-organiza-tional plan." He explained that because of the restructuring, he was now responsible for only one-third of his previous workload, and did not have enough to do to fill the hours.

By late-February or early-March, Weeks had begun looking for another job. Specifically, he initiated job discussions with one of SHI's Florida dealers, and began negotiating employment opportunities with that company. Around that same time, SHI learned that Weeks allegedly had been disparaging SHI to dealers and prospective customers, and had been discussing his EEOC claim with SHI's customers or prospective customers and dealers. Weeks admitted in his deposition testimony that he discussed his employment dispute with several of SHI's customers, and responded to interrogatories that he had discussed his EEOC charge with at least three of SHI's customers or prospective customers.

On March 9, 1992, C.I. Kim sent Weeks a memo reprimanding Weeks for disparaging SHI to dealers and prospective dealers by discussing the EEOC charges. The memo also stated that SHI would not retaliate against Weeks for instituting the EEOC charge, but asked Weeks to air his grievances before the EEOC and not before customers. The memo concluded, "Please be advised that any future efforts to poison SHI's relationship with its dealers and prospective dealers will result in disciplinary action, up to and including, termination of your employment."

On March 13, 1992, C.I. Kim received a letter of resignation from Weeks which was dated March 16, 1992. On March 17, 1992, SHI entered into a dealer agreement with Florida Equipment & Service, Inc. ("FES") under which FES would serve as SHI's exclusive dealer in Florida (excepting the panhandle counties). On March 18, 1992, Weeks became an employee of FES.

On May 15, 1993, the EEOC gave Weeks notice of his right to institute a civil action. This case was initially filed in the United States District Court for the Northern District of Illinois on August 13, 1993. The initial complaint contained seven counts: Count I, Racial Discrimination in Employment; Count II, National Origin Discrimi-

nation in Employment; Count III, Age Discrimination in Employment; Count IV, Retaliatory Discharge; Count V, Breach of Verbal Hiring Promise; Count VI, Promissory Estoppel; and Count VII, Fraud and Misrepresentation.[2] The gravamen of Weeks' employment claims was that his responsibilities and duties were removed and assigned to S.H. Lee on or about January 20, 1992.

After a heated and contentious period of discovery and litigation, which included motions for sanctions and Weeks' motion for recusal of the magistrate judge, SHI filed a motion for summary judgment on April 8, 1996. SHI also filed a contemporaneous Statement of Material Facts in accordance with Local Rule 12(M). Weeks filed a response to the summary judgment motion on May 20, 1996. He did not file a Local Rule 12(N)(3) statement responding to each of the numbered paragraphs in SHI's Rule 12(M) statement, but, rather, filed his own Rule 12(M) Statement of Material Facts which raised additional facts which Weeks believed were in dispute. SHI replied to Weeks' response and to Weeks' Rule 12(M) Statement on June 7, 1996. On July 12, 1996, the district court granted SHI's motion for summary judgment in its entirety and entered final judgment in favor of SHI. *See Weeks v. Samsung*, 933 F.Supp. 711 (N.D.Ill.1996). *Weeks* filed his notice of appeal in this Court in No. 96–2827 on July 22, 1996. Weeks argues that the district court erred in granting summary judgment in favor of SHI on the discrimination claims in Count I and Count II, and on the Count VI fraud claim. He also argues that the district court abused its discretion in terms of several discovery-related issues. In No. 971857, *Weeks* contends that the district court abused its discretion in awarding costs to SHI. This panel determined that No. 97–1857 is a successive appeal to No. 96–2827 and we agreed to consider it with the merits of the underlying action. We affirm the district court in both causes.

### Analysis

◼ We review *de novo* the district court's grant of summary judgment. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). To determine whether a genuine issue of material fact exists, we construe the evidence in the light most favorable to the party opposing the motion and draw all justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). A genuine issue of material fact is not demonstrated by the existence of "*some* alleged factual dispute between the parties," *id.* at 247, 106 S.Ct. at 2510, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In that regard, pointing out the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to show a genuine issue of material fact. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. Rather, a genuine issue of material fact does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. Because employment cases often turn on questions of intent and credibility, courts weighing summary judgment motions in these cases must take care not to invade the province of the factfinder by attempting to resolve "swearing contests and the like." *See Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997). However, employment cases are governed by the same rules that govern other summary judgment cases, and they are equally amenable to summary disposition so long as there

---

**2.** The original complaint erroneously labeled Count VII as Count VI, and also alleged a violation of the Illinois Assumed Name Act. Weeks' opening brief in this Court also erroneously refers to the fraud claim as Count VII. It is, in fact, Count VI in the second amended complaint. The second amended complaint, filed on March 18, 1996, did not contain an age discrimination claim.

is no genuine dispute as to the material facts. *Id.* (citations omitted); *see also Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394 (7th Cir.1997).

In addition to the normal parlance about the rules governing summary judgment, this case and the arguments advanced by Weeks on appeal require us to reiterate the duties of a party opposing summary judgment. In *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990), the Supreme Court stated:

> In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint.... The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.

*Id.; see also Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1058 (7th Cir. 1994) ("Selfserving assertions without factual support in the record will not defeat a motion for summary judgment.") (citation omitted).

**3.** The U.S.–Korea FCN Treaty is one of a series of Friendship, Commerce and Navigation Treaties signed by the United States and various countries after World War II. The FCN Treaties were originally negotiated primarily to encourage American investment abroad, but also secured reciprocal rights and thus granted protection to foreign businesses operating in the United States. *See MacNamara,* 863 F.2d at 1138 (citing Walker, Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice, 5 AM. J. COMP. L. 229 (1956)). In *Wickes v. Olympic Airways,* 745 F.2d 363, 367–68 n. 1 (6th Cir.1984), which involved an FCN Treaty between the United States and Greece, the Sixth Circuit analyzed the legislative history of the FCN treaties:

> The post-World War II Friendship, Commerce and Navigation treaties were negotiated in a period characterized by so-called "percentile" restrictions which required American companies operating abroad to hire a certain percentage of citizens of the host country. These restrictions were thought to have the effect of

## I. Treaty of Friendship, Commerce and Navigation: United States–Korea

■ Counts I and II of Weeks' complaint allege that his replacement by S.H. Lee, a Korean citizen, was discriminatory in violation of Title VII. Taking as true the allegation that S.H. Lee replaced Weeks at SHI, we hold that SHI's actions are protected by the Treaty of Friendship, Commerce and Navigation ("FCN Treaty") between the United States and the Republic of Korea. *See MacNamara v. Korean Air Lines,* 863 F.2d 1135 (3d Cir.1988), *cert. denied,* 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989); *see also Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1401 (7th Cir.1997) (applying U.S.–Japan FCN Treaty); *Papaila v. Uniden America Corp.,* 51 F.3d 54, 55 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 187, 133 L.Ed.2d 124 (1995) (same); *Fortino v. Quasar Co.,* 950 F.2d 389 (7th Cir.1991) (same).[3]

Article VIII(1) of the FCN Treaty between the United States and the Republic of Korea, November 28, 1956, United States–Korea, 8 U.S.T. 2217, T.I.A.S. 3947 provides:

> Nationals and companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, *executive personnel,* attorneys, agents and other specialists of their choice.

inhibiting American companies operating abroad from hiring the people in whom they had the greatest confidence.... The legislative history of the post-war treaties suggests that both parties deemed the right to utilize the services of their own nationals in managerial, technical, and confidential capacities to be critical.

(quoted in *MacNamara,* 863 F.2d at 1144). "In short, this history persuasively demonstrates that the target of Article VIII(1) [of the treaty] was domestic legislation that discriminated on the basis of citizenship and that the provision was necessary for the limited purpose of securing to foreign investors the freedom to place their own citizens in key management positions, thus facilitating their operational success in the host country." *MacNamara,* 863 F.2d at 1144–45. As the Supreme Court observed in *Sumitomo Shoji America v. Avagliano,* 457 U.S. 176, 187–88, 102 S.Ct. 2374, 2380–81, 72 L.Ed.2d 765 (1982), the purpose of the treaties was not to give foreign corporations greater rights than domestic corporations but rather to free them from discrimination based on their alienage.

8 U.S.T. at 2223 (emphasis added). In *Mac-Namara*, the Third Circuit confirmed that the Treaty insures that "foreign businesses clearly have the right to choose citizens of their own nation as executives *because they are such citizens.*" *MacNamara*, 863 F.2d at 1144; *see also Fortino*, 950 F.2d at 393; *Wickes v. Olympic Airways*, 745 F.2d 363, 368 (6th Cir.1984). After analyzing the legislative history, the *MacNamara* court found that "the target of Article VIII(1) was domestic legislation that discriminated on the basis of citizenship and ... the provision was necessary for the limited purpose of securing. to foreign investors the freedom to place their own citizens in key management positions, thus facilitating their operational success in the host country." *MacNamara*, 863 F.2d at 1144–45. Moreover, the *MacNamara* court concluded "that the right of a foreign business under Article VIII(1) to engage the services of its own citizens as executives was intended to include the right to engage them as replacements for existing personnel." *Id.* at 1141. The *MacNamara* court thoroughly analyzed the Treaty and its legislative history and held that application of the Treaty did not conflict with Title VII of the Civil Rights Act of 1964. *Id.* at 1142–47, 1147 ("[T]here is no logical or pragmatic conflict between the right of foreign businesses under Article VIII(1) to engage their own citizens as managers because of their citizenship and the right of employees in the United States to be free from intentional race, age, and national origin discrimination."). We also clearly stated in *Fortino*, in reference to an identical treaty between the United States and Japan, that "[t]he exercise of a treaty right may not be made the basis for inferring a violation of Title VII." *Fortino*, 950 F.2d at 393.

In this case, the district court granted summary judgment in favor of SHI on Counts I and II, finding that the FCN Treaty applied to protect SHI's employment decision. *Weeks*, 933 F.Supp. at 713–14 (citing *Fortino v. Quasar Co.*, 950 F.2d 389 (7th Cir.1991); *MacNamara v. Korean Air Lines*, 863 F.2d 1135 (3d Cir.1988), *cert. denied*, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989)). The district court found that S.H. Lee's status as an E–1 visa holder was "strong evidence" of his executive status, because E–1 visas are "granted exclusively to foreign employees who perform duties of a supervisory or executive character." *Id.* 933 F.Supp. at 713 (quoting *MacNamara*, 863 F.2d at 1141–42). Weeks contended that S.H. Lee replaced him as the National Sales Manager, which the district court noted "certainly is an executive position." *Id.* The district court therefore concluded that SHI was entitled to favor S.H. Lee over Weeks for an executive job, and granted summary judgment in favor of SHI on the employment discrimination claims.

In *Fortino*, we also agreed with *MacNamara* that an FCN Treaty protected both American and foreign companies against suits based on the exercise of these kind of employment decisions. *Fortino* discussed an FCN Treaty between the United States and Japan; however, its analysis is appropriate here since the relevant provisions of the United States–Japan FCN Treaty are identical to the United States–Korea FCN Treaty. Although the parties did not raise the FCN Treaty to the district court in *Fortino*, we considered its impact on the plaintiff's Title VII claims for the sake of international comity, amity, and commerce. *Id.* at 391. We recognized that the FCN treaty "permits discrimination on the basis of citizenship, not of national origin; Title VII forbids discrimination on the basis of national origin, not of citizenship." *Id.* at 391–92. We listed some of the benefits given to Japanese but withheld from American employees, and although we found the disparate treatment "was favoritism all right," we reasoned that "discrimination in favor of foreign executives given a special status by virtue of a treaty and its implementing regulations is not equivalent to discrimination on the basis of national origin." *Id.* at 392. We concluded, like the Third Circuit in *MacNamara*, that "[t]he exercise of a treaty right may not be made the basis for inferring a violation of Title VII." *Id.* at 393.

Because it is clear that Weeks' claims run "smack" into the United States–Korea FCN Treaty (*see Wallace*, 103 F.3d at 1401), the only way around the FCN Treaty is for Weeks to argue that it somehow does not apply. He does this by contending that Arti-

cle VIII(1) allows for the choice of *executives,* and that S.H. Lee does not qualify for executive status, or, at least, there is a dispute of material fact as to whether S.H. Lee was an executive. Weeks also argues that the district court erred by relying exclusively on S.H. Lee's unsupported and unreviewed visa status to find that S.H. Lee was an executive. He contends that neither S.H. Lee's professional credentials nor his E–1 visa status make him an "executive" for purposes of Article VIII(1), and that *Fortino* and *MacNamara* are inapposite because, in both cases, the executive status of the foreign nationals who replaced the American plaintiffs was undisputed. Weeks further contends that the district court erred in focusing on the employment position which S.H. Lee was to assume, rather than on the factual dispute over S.H. Lee's executive job credentials both before and after he allegedly replaced Weeks. We reject all of these arguments.

First, as we noted above, the district court did not rely solely on S.H. Lee's E–1 visa status to determine that he was an executive for purposes of Article VIII(1). The court relieved on the visa *plus* the nature of the job S.H. Lee allegedly took over from Weeks. Second, the executive status of the foreign national *was* in issue in *MacNamara.* The plaintiff there offered a similar argument as to the meaning of "executive" for purposes of Article VIII(1) and contended that this created a material dispute of fact. *MacNamara,* 863 F.2d at 1141–42. The Third Circuit explained: "The right secured by Article VIII(1) is the right to engage executive personnel of one's choice and . . . the relevant inquiry is whether *MacNamara's* responsibilities were reassigned to an 'executive' within the meaning of that Article." *Id.* at 1141. The court found it undisputed that *MacNamara's* replacement, Wan Gin Chung, "entered and remained in the United States pursuant to an E–1 'treaty trader' visa which is granted exclusively to foreign employees who perform duties of a supervisory or executive character, and that Mr. Chung, following the reorganization, served as sales manager for a region extending from Pennsylvania to Florida." *Id.* at 1141–42 (footnote omitted). The *MacNamara* court stated: "[T]he treaty trader pro-

visions of the Immigration and Nationality Act [the provisions authorizing the E–1 visa] were enacted to complement the FCN Treaties and . . . the government's decision granting entry to Mr. Chung as an E–1 treaty trader is *strong evidence* of his 'executive personnel status.'" *Id.* at 1142 (emphasis added). Similarly, in *Fortino,* this Court referred to the E–1 visa as evidence tending to prove executive status. *Fortino,* 950 F.2d at 392 ("The propriety of Matsushita's assigning its own executives to Quasar is further confirmed by the issuance of E–1 and E–2 visas to the Japanese expatriate executives."). Clearly, neither the *MacNamara* court, the *Fortino* court, nor the district court here, used E–1 visa status as *conclusive* evidence of executive-status; rather, each court considered the E–1 visa status as some or *strong* evidence.

In support of his contention that Mr. Chung should not be considered an "executive" for purposes of Article VIII(1), MacNamara argued that even if Chung could be considered an executive, it was by virtue of his responsibilities other than, or in addition to, those received by MacNamara because MacNamara's job did not entail "executive" duties. *MacNamara,* 863 F.2d at 1142. The court rejected this:

> [T]he suggested approach of fragmenting the responsibilities of a "chosen" executive and second-guessing whether they are sufficiently "executive" is inappropriate. The focus must be on the overall responsibility of the "chosen" executive. In a situation of this kind, if a foreign business decides that the responsibilities of the individual replaced are such that they require the attention of a foreign national "executive," that is sufficient.

*Id.* (footnote omitted). Although it is true that *MacNamara* did refer to Mr. Chung's responsibilities, it is also clear that the court did not focus exclusively or even primarily on them. We think it clear that the Third Circuit considered *both* the fact that Mr. Chung entered the United States on an E–1 visa and that he took over a job that, by virtue of its geographic expansiveness, necessarily had an executive character. The court did not delve into the background of Mr. Chung to

determine whether he qualified as an executive before issuance of the visa, nor did the court independently investigate the reasons why the State Department issued Mr. Chung an E–1 visa. As to S.H. Lee, we likewise will not conduct either investigation; engaging in these investigations would frustrate the intent behind FCN treaties, which we have no authority or desire to do.[4]

■ Like the *MacNamara* court, we find that S.H. Lee's E–1 visa is strong evidence of his executive status. Moreover, if a sales manager for a region covering Pennsylvania to Florida was an executive, surely a sales manager for the entire country is an executive. We will not "fragment" either Weeks' or S.H. Lee's job responsibilities in order to determine whether they are executive by design. Rather, we are convinced that S.H. Lee's status is sufficiently "executive" in character to come within the ambit of the plain language of Article VIII(1). SHI's replacement of Weeks by S.H. Lee involved SHI's decision to engage an executive of its choice and is therefore protected by the FCN Treaty.

■ Finally, Weeks argues that even if Article VIII(1) permitted SHI to hire S.H. Lee in place of Weeks, summary judgment was only properly granted as to his claim of disparate treatment under Title VII, and not as to his claims of disparate impact. Weeks is incorrect. *MacNamara* addressed both disparate treatment and disparate impact, and held that disparate impact liability may not be imposed because Article VIII(1) and Title VII conflicted. 863 F.2d at 1148. *MacNamara* discussed how disparate impact cases usually focus on statistical evidence of disproportional effects. But, when dealing with countries such as Korea where the population is largely homogenous, "the statistical disparity between otherwise qualified noncitizens of a particular race and national origin, and citizens of the foreign country's race and national origin is likely to be substantial." *Id.* That would create a problem in disparate impact cases because, for a foreign company from a country like Korea with a largely homogenous population, merely exercising its rights under the FCN Treaty could result in a Title VII violation. Therefore, the *MacNamara* court concluded that disparate impact liability under Title VII (and under the ADEA) based on a foreign employer's practice of engaging its own nationals could not be reconciled with Article VIII(1). Accordingly, the court held that disparate impact liability could not be imposed. *Id.*

In *Fortino*, we also found that when dealing with a country which has a homogenous population, such as Japan, using the correlation between citizenship and national origin to infer national-origin discrimination from a treaty-sanctioned preference for Japanese citizens who are also of Japanese origin would nullify the Treaty. *Fortino*, 950 F.2d at 392–93. "This is true whether the correlation is used to prove intentional discrimination ... or to establish a disparate impact that the employer must justify on nondiscriminatory grounds." *Id.* at 393. Therefore, Article VIII(1) of the U.S.–Korea FCN Treaty protects SHI's decision to replace Weeks, an American citizen, with S.H. Lee, a Korean citizen, from claims of both disparate treatment and disparate impact under Title VII. We affirm the district court's grant of summary judgment in favor of SHI on Counts I and II.

## II. Fraudulent Misrepresentation

In Count VI, Weeks alleged fraudulent misrepresentation under Illinois law stemming from what Weeks described as "a systemic process of deception" by SHI. In responding to SHI's summary judgment motion, Weeks stated: "[T]he Defendants made numerous on going [sic] fraudulent material misstatements and omissions, over a one year period, for the purpose of securing Plaintiff's expertise, experience, business contacts and continued employment." In his second-amended complaint, Weeks alleged that SHI made eight material misrepresentations of fact and intentionally or negligently concealed a number of other material facts. Weeks alleged that he reasonably relied on SHI's fraudulent and ma-

---

4. We do note that neither party has pointed to anything in the record to suggest that S.H. Lee's E–1 visa was not properly issued.

terial misrepresentations to his detriment, and suffered damages greater than the amount required for diversity jurisdiction. He also alleged that the fraudulent actions were willful and intentional and that he was entitled to punitive damages of $100,000. He further requested costs and attorney's fees.

In his Response, Weeks divided SHI's alleged misconduct into seven areas Weeks believed presented genuine issues of material facts regarding the misrepresentation:

(a) Pre–Hiring Misrepresentations Regarding Plaintiff's Promotion Opportunities

(b) Post–Hiring and On-going Misrepresentation by Failure to Inform Plaintiff of a Material Change in Employment Rank and Status

(c) Post–Hiring Misrepresentation of Failing to Inform Plaintiff of the True Reason Why His Probation Period Was Extended

(d) Post–Hiring Misrepresentation of Failing to Inform Plaintiff of the True Reason Why He Was Being Sent to Korea

(e) Post–Hiring Misrepresentation of Failing to Inform Plaintiff That Product Introduction Dates were Inaccurate

(f) Post–Hiring Misrepresentation of SHI's Organizational Structure

In granting summary judgment for SHI, the district court dismissed each of these alleged disputes of fact. The district court found that some statements in section (a) were not actionable because Weeks could not show that they were statements of material facts as opposed to mere promises or opinions. *Weeks,* 933 F.Supp. at 714–15 (citing *LaScola*

*v. U.S. Sprint Communications,* 946 F.2d 559, 568 (7th Cir.1991)). The district court also found that Weeks did not present sufficient testimony to raise an issue of fact as to SHI's pre-hiring representations to Weeks about the number of viable dealerships, as alleged in section (a). *Id.* at 715. The district court further found that section (b) did not show misrepresentation, section (c) was not supported by evidence, and sections (d), (e), and (f) did not demonstrate misrepresentation because *Weeks* did not cite particular paragraphs in his 12(M) statement or because specific evidence supporting *Weeks'* contentions was non-existent.[5]

On appeal, *Weeks* raises four separate arguments as to how the district court erred in finding that he had not raised genuine issues of material facts as to his alleged claims of fraudulent misrepresentations. He contends that these disputed facts would preclude the entry of summary judgment against him. We discuss each in turn.

A. *Sections VII(a) & (b) Statements— Promises or Opinions?*

■ In sections (a) and (b) of his response motion, Weeks argued that prior to his employment with SHI, C.I. Kim misrepresented the extent of the growth and advancement Weeks could expect if he were to join SHI. Although the parties do not agree on much in this case, they do agree that, during Weeks' initial interview, C.I. Kim discussed the kind of company Samsung was in terms of economic capital, the product Samsung produced, and what kind of future growth the company planned. The parties also agree

---

5. As we pointed out above, Weeks did not properly abide by the procedure established under the district court's Local Rules for contesting SHI's Statement of Material Facts. In *Feliberty v. Kemper Corp.,* 98 F.3d 274, 277–78 (7th Cir. 1996), we discussed the appropriate procedure for summary judgment under the local rules for the Northern District of Illinois. We repeated that the moving party must supplement its summary judgment motion with a statement of undisputed material facts under Rule 12(M), and the non-moving party must supplement its response with a statement of disputed material facts under Rule 12(N). *Id. See generally Brasic v. Heinemann's Inc.,* 121 F.3d 281, 283–85 & nn. 1–3 (7th Cir.1997). "If the non-moving party fails to file a 12(N) statement, the district court will assume that the non-moving party has ad-

mitted the moving party's version of the facts, and the court will not continue to construe facts in favor of the nonmoving party." *Feliberty,* 98 F.3d at 277; *see also Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1313 (7th Cir.1995); *Johnson v. Gudmundsson,* 35 F.3d 1104, 1108 (7th Cir.1994). We have also repeatedly said that district courts have broad discretion to enforce Rule 12(N) strictly. *Feliberty,* 98 F.3d at 278. It is not entirely clear in this case whether Weeks' technical failure to abide by the rules deems all of SHI's facts admitted. However, because we fail to find any disputed "genuine issues of material facts" here, perhaps his technical violation of the rules may have harmed Weeks. We caution against such improper compliance with the Local Rules in the future.

that C.I. Kim explained to Weeks that future growth was the reason the company needed a sales manager. Weeks also contends, however, that C.I. Kim made promises or representations to Weeks about Weeks having a secure career or lifetime employment with SHI and the possibility of Weeks eventually becoming president or vice-president. Weeks argues now that the district court failed to take into account the circumstances surrounding the making of these statements and the individuals who made them. He argues that C.I. Kim held himself out as having special knowledge, and that because SHI was a foreign corporation and a new entrant into the U.S. market, Weeks was in the position of having to rely on what C.I. Kim told him about his growth potential with the company. The record, however, does not support Weeks' contentions such that an issue of triable fact is created.

First, we are unable to find any evidence in the record, other than Weeks' own allegations and deposition testimony, tending to suggest that C.I. Kim promised Weeks lifelong employment with SHI or career security. Although Weeks testified that C.I. Kim discussed with him Korean "traditions" and traditions of lifetime employment, he also admitted that C.I. Kim did not make any guarantees to him about working three or five years, for example, with SHI. Weeks also argues that the idea that "Asian culture still embraces lifetime/long term employment" was "reiterated" by Y.S. Kim, then-president of Samsung, in his deposition. We do not believe that is a fair and accurate characterization of Y.S. Kim's testimony.[6] We have been unable to uncover any other evidence in the record, besides Weeks' uncorroborated and unsubstantiated testimony, that C.I. Kim promised Weeks lifetime employment with SHI. As to Weeks' contention that SHI misrepresented its intent for Weeks to maintain his status as National Sales Manager even after the restructuring,

we have been unable to uncover any evidence other than Weeks' own statements. At his deposition, Weeks admitted that no one from Samsung had explicitly told him that he would be the national sales manager supervising three regional salespeople under the restructuring plan. He testified that it was "pretty much an assumption on my part, because it went along with the duties and responsibilities of national salesman." We also think the revised Job Description which Weeks received on June 17, 1991 clearly indicated that Weeks' job title was no longer "National Sales Manager."

As we have repeatedly explained, a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment. *Cowan v. Glenbrook Security Services, Inc.,* 123 F.3d 438, 446 (7th Cir. 1997); *Edward E. Gillen Co. v. City of Lake Forest,* 3 F.3d 192, 196 (7th Cir.1993) (stating that a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary or affidavits). *See also Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Moreover, the clear language in the March 18, 1992 letter of employment from C.I. Kim to Weeks explicitly informed Weeks that his employment would be on an "at-will basis" and could be "terminated at any time upon SHI's sole discretion." In his reply brief, Weeks argues at the eleventh hour that "the term 'at-will' reflects legal doctrine which is not fully understood by many lay individuals," but we do not believe Weeks could have misinterpreted the clear language in the March 18 memo regarding the duration of his employment. We find that any discussions between Weeks and SHI as to the length of Weeks' employment or his advancement with SHI as national sales manager do not constitute actionable misrepresen-

6. Y.S. Kim's actual deposition testimony was:
Q: Well, I presume that many applicants are looking for employment security, and I'm wondering if that is something that is touted by your company as an opportunity. I know it is with many other large industrial companies in Asia.
A: No, we don't get into that possibility at all. Maybe you are making a comparison between some companies in Asia and those in the United States, and it would be correct to say that a lot of employees have longer employment in Asian companies, but we don't necessarily advertise it that there is a lifetime employment possibility automatically. It definitely depends on the employee's performance once he's hired.

tation or establish genuine issues of material fact.

Even if the record supported Weeks' contentions about what SHI represented to him at the time of his hire, these representations would not be actionable under *LaScola v. U.S. Sprint Communications*, 946 F.2d 559 (7th Cir.1991) because they would be, at most, promises or opinions, and not statements of material fact.

In *LaScola*, employees of U.S. Sprint lured LaScola into working for them by telling LaScola that U.S. Sprint was an excellent company comprised of "a bunch of straight shooters;" by telling him that the company had a lucrative compensation plan; and by telling him that he would receive commissions due upon sale of an account. 946 F.2d at 561. After LaScola's employment with U.S. Sprint was terminated, LaScola sued, alleging a breach of the covenant of good faith and fair dealing, pre and post-hiring fraudulent misrepresentations, and breach of contract. The district court granted summary judgment in favor of U.S. Sprint. On appeal, we affirmed the grant of summary judgment on all counts.

In analyzing the fraud count, we first described the tort of fraudulent misrepresentation under Illinois law. Illinois law requires a plaintiff to prove the following elements by clear and convincing evidence: (1) the representation must be a statement of material fact, rather than a mere promise or opinion; (2) the representation must be false; (3) the maker of the statement must know or believe that the representation is false; (4) the receiver of the statement must reasonably rely on its truth; (5) the statement must have been made with the purpose of causing the receiver to act; and (6) the receiver must detrimentally rely on the statement. *Id.* at 567–68; *see also Europlast, Ltd. v. Oak Switch Systems, Inc.*, 10 F.3d 1266, 1272 (7th Cir.1993). As to the first element, we found that the statements the company made to LaScola before hiring him were "too general and difficult to substantiate to be considered statements of fact." *La Scola*, 946 F.2d at

568. We also recalled that a statement that "merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable representation." *Id.* (quoting *West v. Western Cas. & Sur. Co.*, 846 F.2d 387, 393 (7th Cir.1988)). As to the statements made by U.S. Sprint to LaScola (which are not unlike those made by SHI to Weeks), we stated:

> It is undisputed that these statements were made to LaScola when he was being recruited by the company.... [S]uch comments are common between a prospective employer and employee and are informal expressions of goodwill.... The statements made to LaScola in the prospective employment situation were not fact; rather, they were merely statements of opinion and they cannot qualify as fraudulent misrepresentations.

*Id.* (citations and internal quotation omitted). We agree with the district court that the pre-hiring statements made by SHI through its agent C.I. Kim did not amount to statements of material fact, but, rather, were merely promises or opinions. They cannot qualify as fraudulent misrepresentations, and for that reason, as well, Weeks has failed to set forth a genuine issue of material fact as to these allegations.

### B. *Number of Viable Dealerships*

Weeks also argues that C.I. Kim fraudulently misrepresented the number of viable dealerships SHI had in North America, and that this misrepresentation harmed Weeks because he might not have taken the job with SHI if he were apprised of its true financial condition in North America. Weeks claims that C.I. Kim told him there were eleven viable dealerships in North America, while Weeks testified at his own deposition that he believed there were only five viable dealerships, and the rest of them were in severe financial difficulty.[7] Weeks says that we do not have to rely solely on his deposition testimony that there were only five viable

---

7. Weeks' "Rule 12 M" Statement of Material Facts stated: "103. Plaintiff testified that C.I. Kim told him that SHI had 11 dealers in North America at the time Plaintiff was extended a job offer. (*See,* Exhibit 11, p. 27)." In support of this statement, Weeks cites to a page in the transcript of C.I. Kim's deposition, but we find no reference to a discussion of the number of dealerships whatsoever on that page.

dealerships, but that we can also rely on his testimony that he gave a memo to C.I. Kim regarding the number of dealerships in North America. Weeks, however, does not give us any help in finding this memo in the record. He also contends that the district court overlooked Exhibit 13, which is a memo Weeks sent to C.I. Kim shortly after he was hired. Weeks now argues that the district court failed to consider all of this evidence when it ruled against him. Actually, the district court's opinion states:

> In section VII(a) of his response brief, Mr. Weeks argues that C.I. Kim's statement that the company had 11 dealers in North America was false because the company had only 5 financially viable dealerships. In support of his argument, Mr. Weeks cites to his own deposition testimony that defendants had 5 viable dealers. This testimony is insufficient to give rise to an issue of fact as to whether C.I. Kim's statement was a misrepresentation. *Jugobanka d.d. New York Agency v. Unis International Corp.*, No. 93 C 1865, 1995 WL 3987, *4 (N.D.Ill. Jan. 5, 1995).

*Weeks,* 933 F.Supp. at 715. This quotation indicates that the district court did indeed consider Weeks' testimony. Although it is true that the district court is silent as to Exhibit 13, we have reviewed the documents Weeks references and find them to be unhelpful to his position.[8] Weeks' own subjective and uncorroborated testimony again is insufficient to preclude the entry of summary judgment against him.

### C. *Weeks' Probation Period and Its Extension*

■ In a one-page argument on appeal, Weeks takes issue with the district court's ruling regarding his complaints about SHI's extension of his probation period. The district court stated:

> In section VII(c), Mr. Weeks asserts that defendants misrepresented to him that they were extending his probation period

to provide him with travel benefits. Mr. Weeks provides no evidence, however, that defendants actually extended his probation period because, as he contends, they were upset with him in connection with the "Rental Pool Program."

*Weeks,* 933 F.Supp. at 715. There is indeed testimony in this case by K.J. Cho, a high-ranking manager with Samsung in Korea, that he was concerned about Weeks' conduct in connection with this "Rental Pool Program." However, Weeks has presented no evidence to show any connection between his conduct in regard to the "Rental Pool Program" and the extension of his probation period. More significantly, he has failed to allege how the extension of his probation period had any effect on him, or how any factual dispute over why his probation period was extended (if there was such a dispute) would be material in terms of affecting the outcome of this case. Absent any showing in this regard, Weeks is unable to establish a genuine issue of material fact as to any alleged misrepresentation about his probation period.

### D. *Section VII(d), (e), and (f) Claims*

In sections (d), (e), and (f) of his summary judgment response, Weeks alleged that SHI made misrepresentations to him by (1) failing to inform him of why he was being sent to Korea, (2) failing to tell him that certain product introduction dates were inaccurate, and (3) misrepresenting the true nature of SHI's organizational structure. The district court dismissed these allegations, explaining: "Sections (d), (e) and (f) fail to demonstrate a misrepresentation because Mr. Weeks neglects to cite to either a particular paragraph in his Rule 12(M) statement or specific evidence in support of his contentions." *Weeks,* 933 F.Supp. at 715. Again, as to all three of these alleged misrepresentations, Weeks offers only his own unsubstantiated and self-serving testimony, with no other supporting

---

8. Although Weeks contends that this exhibit supports his contention that there were only five viable dealerships, it merely supports his contention that dealership development was not as far along as he "had originally suspected." Exhibit 13 contains a drawing of a map of the United States with squares representing existing dealerships and circles representing potential dealer-

ships. Actually, neither party seems to have interpreted this drawing accurately. Weeks says it supports his position that there were five viable dealerships, and SHI says it supports its position that there were eleven viable dealerships. Although we hardly find this to be material, we have only been able to locate nine small squares on the map.

evidence, and therefore has not established the existence of a genuine issue of material fact. Weeks' argument on appeal regarding this ruling is hardly worthy of our attention—he merely says that he does reference statements of material fact and that because his failure to reference certain statements should be viewed only as a clerical error, "if the District Court did not deem it equitable to review Plaintiff's Response without this specific citation, then the District Court should have granted [him] leave of short duration to supplement his Response." We are certain, however, that it is not the district court's responsibility to help a plaintiff try his lawsuit or help him create issues of fact to defeat summary judgment.

### E. Promissory Fraud

 Finally, we briefly address Weeks' contention that the Illinois doctrine of promissory fraud can relieve him of the district court's grant of summary judgment against him on his fraud claims. Weeks is correct that Illinois does not provide a remedy for fraudulent promises unless the promises are part of a scheme to defraud. *Desnick v. American Broadcasting Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir.1995) (citing *Willis v. Atkins*, 412 Ill. 245, 106 N.E.2d 370, 377–78 (1952); *Stamatakis Industries, Inc. v. King*, 165 Ill.App.3d 879, 117 Ill.Dec. 419, 520 N.E.2d 770, 772–73 (1987); *Bower v. Jones*, 978 F.2d 1004, 1011–12 (7th Cir.1992)). However, SHI is also correct that Weeks waived this argument by failing to advance it in the district court. "An issue not presented in the court below cannot be raised for the first time on appeal and form a basis for reversal." *Ferrell v. Pierce*, 743 F.2d 454, 463 (7th Cir.1984) (quoting *American Fletcher Mortgage Co. v. Bass*, 688 F.2d 513, 520 (7th Cir.1982)).

Even if it were not waived, Weeks has not done enough to show that he can use this theory of liability. In *Desnick*, we explained how we would interpret the theory of promissory fraud under Illinois law:

A great many promises belong to the realm of puffery, bragging, "mere words," and casual bonhomie, rather than to that of serious commitment. They are not intended to and ordinarily do not induce reliance; a healthy skepticism is a better protection against being fooled by them than the costly remedies of the law. In any event it is not our proper role as a federal court in a diversity suit to read "scheme" out of Illinois law; we must give it some meaning. Our best interpretation is that promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy.

*Id.* at 1354.

 In his opening brief, all Weeks argues is: "The sequence of events strongly indicates that there was a deliberate scheme to induce the Plaintiff to work for the Defendants until the Defendants obtained what they had failed to accomplish without the assistance of a veteran Caucasian–American representative." He has not, in the summary judgment sense, raised any genuine fact issues. A "strong indication" is not enough to satisfy the requirements for proving promissory fraud under Illinois law. Therefore, even if Weeks had not waived this issue by failing to raise it in the district court, he is unable to prove its application to these facts.

In sum, Weeks has not carried his burden of establishing the existence of any genuine issue of material fact as to any of the representations alleged in his fraud claim. Our thorough review of the record in this case establishes that Weeks has generally made self-serving assertions without pointing to factual support in the record in order to combat the entry of summary judgment against him. In many instances, he has cited only to his own deposition testimony in which he alleges fraud and misconduct by the defendants and/or their attorneys. That was not enough for him to defeat summary judgment in the district court, and it is surely not enough to gain reversal in this Court. We therefore affirm the district court's grant of summary judgment in favor of SHI as to Count VI.

## III. Discovery Rulings

■ The discovery process in this case was originally bifurcated so that local discovery would take place first, with non-United States discovery to take place upon motion later, if it was needed. On September 8, 1995, the district court referred all discovery-related matters to Magistrate Judge Guzman. On appeal, Weeks alleges a host of complaints about how the district court and the magistrate judge conducted discovery. Weeks argues that the district court abused its discretion in overruling several of his Rule 72(a) Objections to underlying magistrate judge's orders.[9] Weeks also argues that the district court abused its discretion in denying his motion to reconsider the district court's initial denial of its decision not to disqualify Attorney Nam H. Paik on January 3, 1996, and not to disqualify the law firm of Baker & McKenzie. *See Weeks v. Samsung,* 909 F.Supp. 582 (N.D.Ill.1996). In general, Weeks' arguments center on the not unfamiliar complaint that various rulings by the magistrate judge and the district court "reflect an ongoing failure to recognize and consider the facts, issues and arguments raised by Plaintiff's counsel." Weeks feels that his ability to conduct adequate discovery was continually thwarted by the court, which affected his ability to uncover facts to support his case. In his reply brief, he states: "The District Court's erroneous rulings on Plaintiff's discovery motions precluded Plaintiff from bringing forth more direct and indirect evidence of the Defendants' intent to discriminate against and defraud the Plaintiff that would defeat Defendants' Motion for Summary Judgment." The record, however, belies Weeks' claims. Weeks' allegations of fraud and misconduct are merely speculative, and they do not entitle him to more extensive discovery in this case.

■ District courts enjoy extremely broad discretion in controlling discovery. *Leffler v. Meer,* 60 F.3d 369, 374 (7th Cir. 1995) (citation omitted). Because the district court is in a far better position than we are to pass on discovery matters, we will reverse the district court's exercise of discretion as to discovery matters only upon a showing of an abuse of that discretion. *Searls v. Glasser,* 64 F.3d 1061, 1068 (7th Cir.1995) (citing *Jurcev v. Central Community Hosp.,* 7 F.3d 618, 627 (7th Cir.1993), *cert. denied,* 511 U.S. 1081, 114 S.Ct. 1830, 128 L.Ed.2d 459 (1994)). We also will not reverse the district court's decision absent a clear showing that the denial of discovery "would result in actual and substantial prejudice to the complaining litigant." *Id.* (citations omitted); *Leffler,* 60 F.3d at 374–75 (quoting *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 744 (7th Cir.1985)). The district court's review of any discovery-related decisions made by the magistrate judge is governed by Rule 72(a) of the Federal Rules of Civil Procedure, which provides: "The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." FED.R.CIV.P. 72(a); *see also* 28 U.S.C. § 636(b)(1). The clear error standard means that the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made.

We have made a careful and thorough review of the extensive record in this case, and have satisfied ourselves that none of the

---

**9.** Specifically, Weeks argues that the district court erred in overruling his Rule 72(a) Objections to the following rulings by Magistrate Judge Guzman: (1) A February 2, 1996 and March 12, 1996 order requiring Weeks to return privileged documents to SHI and not to disseminate a document authored by Weeks' counsel called "Harry Weeks' Statement of Facts;" (2) A May 30, 1996 Protective Order in favor of SHI as to a billing statement of Baker & McKenzie; (3) A May 29, 1996 order refusing to order Baker & McKenzie to produce a document confirming that it was "litigation counsel" to SHI; and (4) a May 29, 1996 order denying Weeks' request to extend non-U.S. discovery.

The document entitled "Harry Weeks' Statement of Facts" contained accusations that SHI's lawyers engaged in unprofessional and unethical conduct, as well as suggestions that the district court was biased against the plaintiff. Magistrate Judge Guzman had described the document as "nasty," "mean-spirited," and "a one-sided attempt to paint in a very bad light the actions of the defendant in this case." Weeks' counsel admitted authoring the document but claimed no knowledge about its dissemination. That document remains under seal in the district court pursuant to Local Rule 10.

issues Weeks has raised regarding discovery have merit or are worthy of revisiting. In addition, as to most of his arguments, Weeks has failed to allege how the adverse discovery ruling affected the district court's decision to grant summary judgment in favor of SHI. That is, Weeks does not show how he was actually or substantially prejudiced by any of these discovery rulings. From our independent review of the record, we do not believe Weeks has unearthed any incorrect discovery rulings by either the magistrate judge or by the district court.

In our opinion, the district court accurately assessed Weeks' requests for additional discovery:

> It is clear that discovery in this case must end. This case is nearly three years old, and it appears that plaintiff will continue discovery indefinitely, on his own timetable, if an end is not put to it. Plaintiff has had more than ample time to conduct discovery. Depositions very often lead to a desire to depose additional persons. This possibility should have been considered by counsel when he put off depositions until after the close of the original discovery period.

We agree. In sum, we find no error in any of these discovery rulings or any evidence that Weeks was somehow prejudiced in his ability to run his lawsuit and discover relevant information.

### IV. Bill of Costs—Appeal No. 97–1857

On July 26, 1996, SHI filed a motion for Attorney's Fees, which the district court referred to the magistrate judge.[10] On August 12, 1996, SHI filed a Bill of Costs with the district court seeking $19,092.00. Weeks filed an Objection on September 23, 1996. On March 5, 1997, the district court awarded costs to the defendants in the amount of $18,952.00. Weeks appealed from that award, and we agreed to take that appeal along with the merits of the underlying action.

On May 14, 1997, SHI filed a motion to dismiss this appeal, arguing that we lacked jurisdiction to hear an appeal from an award of costs where Weeks did not challenge the power of the district court to award the costs, but only its discretion in doing so. In support of its argument, SHI cited *Intertype Corp. v. Clark–Congress Corp.*, 249 F.2d 626, 628 (7th Cir.1957) and *Poe v. John Deere Co.*, 695 F.2d 1103, 1108 (8th Cir.1982). This panel agreed to take the motion to dismiss along with the merits of the appeal, but we deny the motion and find that we have jurisdiction to consider Weeks' appeal.

SHI is correct in its reading of *Intertype* and *Clark–Congress*. Those cases do stand for the rule that an appeal will not lie from an order awarding costs unless the "power or right of the court to assess certain items of cost is in dispute." *Intertype*, 249 F.2d at 628. Strangely, those rules have almost never been used in this Court. Most likely, that is because almost all cost appeals can somehow be semantically phrased so that they appear to challenge the district court's "right" to do what it did. This case is no different. Although we disagree with Weeks' arguments, he has challenged the district court's authority or right to award costs. He does argue that the district court abused its discretion in awarding certain travel, deposition, transcript, interpreter, and copying costs. However, in addition, he contends that the district court should not have applied the normal presumption of costs in favor of SHI, the prevailing party, because it did not take into account misconduct by SHI and its attorneys. He also invokes the phrase "allowance" of costs, which we also translate as a complaint about the district court's power to award costs. We therefore have jurisdiction to hear this appeal.

Federal Rule of Civil Procedure 54(d) provides, in relevant part, that "costs other than attorney's fees shall be allowed as of course to the prevailing party unless the court otherwise directs." *See* FED.R.CIV.P. 54(d). SHI is the "prevailing party" because the district court granted summary judgment in its favor on all counts. *Hudson v. Nabisco Brands, Inc.*, 758 F.2d 1237, 1242 (7th Cir.

---

**10.** On March 5, 1997, the district court approved the magistrate judge's award of attorney's fees to SHI in part, but requested supplemental briefing to determine the amount to be awarded. To date, the fee award has not been reduced to a judgment, and this appeal challenges only the district court's award of costs pursuant to the Bill of Costs.

1985), *overruled on other grounds, Provident Bank v. Manor Steel Corp.*, 882 F.2d 258 (7th Cir.1989). We have consistently interpreted Rule 54(d) as providing a strong presumption that the prevailing party will recover costs, with the ultimate decision resting within the district court's discretion. *Finchum v. Ford Motor Co.*, 57 F.3d 526, 533 (7th Cir.1995) (citing *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir.1991)). District courts have broad discretion in determining whether and to what extent prevailing parties may be awarded costs. *Barber v. Ruth*, 7 F.3d 636, 644 (7th Cir.1993); *SK Hand Tool Corp. v. Dresser Indus., Inc.*, 852 F.2d 936, 943 (7th Cir.1988), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3241, 106 L.Ed.2d 589 (1989). "[W]e review carefully whether an expense is recoverable, but when we determine that it is, we defer to the district court, which is in the best position to determine the reasonableness of the cost." *SK Hand Tool*, 852 F.2d at 943 (quotation omitted). As long as there is statutory authority for allowing a particular item to be taxed as a cost, we will not overturn a district court's decision that the cost was necessary to the litigation or its determination of what amount is reasonable absent a showing of clear abuse of discretion. *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 642 (7th Cir.1991); *see also Soler v. Waite*, 989 F.2d 251, 255 (7th Cir.1993). The presumption in favor of awarding costs to the prevailing party is difficult to overcome, and the district court's discretion is narrowly confined—the court must award costs unless it states good reasons for denying them. *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.*, 854 F.2d 219, 222 (7th Cir.1988). Generally, only misconduct by the prevailing party worthy of a penalty or the losing party's inability to pay will suffice to justify denying costs. *Id.; see also Hudson*, 758 F.2d at 1242 (stating that to overcome presumption, the losing party must show some fault, misconduct, default or action worthy of penalty by the prevailing side).

Weeks first argues that misconduct by SHI and by its attorneys should justify the denial of costs in this case. We disagree. The record in this litigation paints a picture of a very heated and contentious exchange between the parties, and particularly be-tween the attorneys. Specifically, we consider Weeks' allegations of misconduct by SHI and defense counsel to be baseless and somewhat disruptive and wasteful of the district court's time and resources after a point. Because we affirmed the district court on the merits in No. 96–2827 and did not find any substance in the mudslinging and allegations of fraud against SHI and defense counsel therein, we will not vacate the award of costs on grounds of alleged misconduct in this appeal.

As to Weeks' more specific complaints regarding the various costs awarded, we conclude that the district court did not abuse its discretion in awarding costs. First, the district court was statutorily authorized to award the challenged costs in this case. Under 28 U.S.C. § 1920, a federal court may tax as costs:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

The Supreme Court has determined that 28 U.S.C. § 1920 defines the term "costs" as it is used in Rule 54(d). *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987). Under Crawford, courts are not prevented from interpreting the meaning of the phrases used in § 1920. *Northbrook Excess*, 924 F.2d at 643 (citing *S.K. Hand Tool*, 852 F.2d at 944). Accordingly, deposition costs (including transcripts) as well pretrial and trial transcript costs are authorized under § 1920(2). *SK Hand Tool Corp.*, 852 F.2d at 943–44. Copying costs are authorized under § 1920(4). The costs for interpreters are

authorized under § 1920(6). Travel costs are authorized either under § 1920(3) or under Rule 30. *See* FED.R.CIV.P. 30. Because we have determined that all of these costs are statutorily recoverable, we next discuss whether the district court abused its discretion in finding that these costs were both reasonable and necessary.

■ In awarding costs, the district court stated:

> Defendant's motion for costs is granted in the amount of $18,952.00. The travel costs claimed are ordered paid pursuant to Judge Guzman's earlier orders. I also conclude that the depositions were reasonably necessary. · The copying costs are reasonable in this case. Plaintiff's additional arguments against the imposition of costs are without merit.

We agree with SHI that these statements indicate that the district court considered Weeks' arguments and nonetheless determined that costs were reasonable and necessary. Weeks is concerned with the statement: "Plaintiff's additional arguments against the imposition of costs are without merit." He argues that this is too vague to indicate that the court took into account his remaining arguments as to transcription costs, interpreter costs, and misconduct. Although it might have been more clear had the district court specifically itemized those costs and addressed the misconduct argument, its failure to do so does not warrant reversal of the award of costs. Rather, we interpret the district court's remark to mean that it considered the reasonableness and the necessity of the remainder of the requested costs, and it considered and rejected Weeks' other arguments. Moreover, the final award of costs did reflect a reduction of $140.00 that SHI agreed was not taxable as costs.[11] This indicates to us that the district court properly reviewed the costs to decide whether they were each reasonable and necessary. We do not find any abuse of discretion in the order, and we will not interfere with the district court's discretion in awarding costs to SHI.

### Conclusion

While it may be true that some factual issues are disputed in this case, our thorough and time-consuming review of this voluminous record assures us that none of these disputes are over issues of "material" fact, *i.e.,* issues that could have affected the outcome. More, or additional discovery in this case will not change that fact. It will only prolong this already lengthy case.

At this point, it is necessary to express our displeasure at the unusually discourteous litigation that took place in this case. This case is hardly an example of well-thought-out litigation focused on fact-finding. Rather, it appears to us that much of the litigation was wasteful and duplicative, with motions designed more to sling mud at attorneys and even the court than to unearth the relevant facts. The record also contains many examples of incorrect and missing citations to the record and inaccurate characterizations of the evidence, particularly by Weeks. These kinds of errors hinder the fact-finding process. Weeks' allegations of manufactured documents and perjury by SHI's lawyers are serious charges that we, and SHI's lawyers, do not take lightly, and we did not find evidence in the record that even negligibly supports these allegations. This leads us to believe that these allegations were tactical and dilatory moves rather than charges supported by evidence. We remind the parties, especially Weeks, that civility in litigation is extremely important to the practice of law in this Circuit and in all other courtrooms.

For the foregoing reasons, the district court's decision to grant summary judgment in favor of SHI and against Weeks is AFFIRMED in No. 96–2827. The award of costs in No. 97–1857 is also AFFIRMED.

---

11. In their Reply Memorandum in Support of Their Application for Costs under Rule 54, SHI acknowledged that it was not entitled to $140.00 in costs incurred in obtaining ASCI disks of the transcripts of certain depositions, which accounts for the $140.00 reduction in the award given by the district court.